# United States Court of Appeals

## For the First Circuit

No. 02-1865

UNITED STATES,

Appellee,

v.

VICTOR LABOY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Schwarzer,[*] Senior District Judge.

Jonathan Shapiro for appellant.
John A. Wortman, Jr., Assistant United States Attorney, with
whom Michael J. Sullivan, United States Attorney, was on brief, for
appellees.

December 9, 2003

---

[*]Of the Northern District of California, sitting by
designation.

**LIPEZ, <u>Circuit Judge</u>**. This case requires us to determine whether the district court correctly attributed more than one kilogram of heroin to defendant-appellant Victor Laboy when sentencing him on a drug distribution charge. We must also determine whether the district court correctly imposed a leadership role adjustment for Laboy's gang activities. Finding no error, we affirm.

## I.

From the spring of 1999 until early 2000, the Federal Bureau of Investigation monitored a street gang in Lawrence, Massachusetts known as the Latin Gangsta' Disciples ("LGD"). The FBI suspected that LGD members were, among other activities, selling heroin in the Lawrence, Massachusetts area. The FBI used surveillance devices to monitor LGD meetings and used cooperating witnesses ("CWs") to make controlled purchases of heroin from suspected LGD members.

In the summer of 1999, appellant Victor Laboy made three documented heroin sales to CWs.[1] On July 9, 1999, Laboy sold heroin to a CW who originally wanted to buy from Luis Flores, the highest ranking member of the LGD. Laboy told the CW that he could take care of the CW from his own supply; that he and Flores were partners; and that their source of heroin was the same. Indeed,

---

[1] The total weight of the heroin that Laboy sold on these three occasions was approximately 2.54 grams.

the markings on the packages that Laboy sold that day matched those on packages that Flores sold on previous occasions.  At one point, Laboy suggested that he and the CW join together to sell heroin in nearby Haverhill, Massachusetts.  After the sale, he called Flores, in the CW's presence, in an attempt to replenish his stock.

This scene repeated itself three days later when a CW, again unable to find Flores, instead sought out Laboy.  Laboy again supplied heroin and stated that he and Flores were partners.  Again, he expressed interest in partnering with the CW to sell heroin in another city.

On July 23, 1999, a CW made a third purchase from Laboy.  At this meeting, Laboy stated that he was no longer in partnership with Flores because Flores' source was selling inferior quality heroin and Laboy was losing money on it.  Now he was running his own operation and had at least one person working for him.  Again, he tried to recruit the CW to sell heroin on his behalf.

On July 28, 1999, a CW accompanied Laboy in an attempt to collect money from yet another person who was dealing heroin for Laboy.  During their conversation, Laboy told the CW about his "regular customers," including one who "comes every two days... for six or seven [bundles]."[2]  They proceeded to search for Wilberto

---

[2]The district court estimated that the average bundle of heroin sold by LGD members during the investigation was approximately .23 grams.  The average weight per bundle of heroin that Laboy sold during the three controlled buys was slightly less,

Colon, whom Laboy identified as one of his suppliers.  They planned to purchase 10 grams from Colon that day, and Laboy indicated that he had purchased as much as 20 grams from Colon in the past.  Eventually they discarded the idea because Laboy discovered that Colon had just made a sale of 20 grams.  In Laboy's estimation, there would not be a ready market for more heroin that day.

Laboy was not the only member of the LGD that sold heroin during the summer and fall of 1999.  The FBI documented more than 100 grams of direct heroin sales by Laboy's associates during its investigation.  Several of these members acknowledged a relationship with Laboy.  Wilberto Colon discussed his heroin business with a CW in Laboy's presence and stated that he sold to "Papito," Laboy's street name.  Two CWs stated that they sold several bundles a day on Laboy's behalf.

By the fall of 1999, Laboy had moved to Salem, New Hampshire - a town about six miles from Lawrence.  Nevertheless, he returned to Lawrence to attend LGD meetings.[3]  During these meetings, LGD members discussed the distribution of drug proceeds.  Flores demanded that he receive $50 from each sale by LGD members:

---

at .17 grams per bundle.  Using either figure, the customer to whom Laboy refers would have been buying more than a gram of heroin every two days.

[3]The FBI recorded four LGD meeting between September 12, 1999, and October 24, 1999.  Laboy attended at least two - one on September 29, 1999, and one on October 24, 1999.

"We got a business on Park Street... I give you a bundle [of heroin], I want fifty bucks out of it... if I'm paying for it, you gonna give me my money regardless...."  They discussed the failure of some members to contribute money to the gang "fundle" - a fund used to purchase firearms and bail out gang members who had been arrested.  Members recounted violence against other gangs, and the need to protect LGD's "turf" in Lawrence from anyone else who would try to sell drugs in the area.

At one meeting, LGD member Manuel Rivera referred to Laboy as one of several leaders of the gang, saying to LGD "captain" Edgardo Colon:

> you, T-Roc [Flores], Pinchy [Santiago] and []
> Bocerro [Laboy]... you [] are the ones running
> this... you [] supposed to communicate at all
> times and let each other know what's going
> on... we an organization.

Flores also referred to Laboy as one of several leaders of the gang, stating that, if anything happens, "I want it brought to me... if not brought to me, brought to one of the heads,... Pinchy [Antonio Santiago,]... Galdi [Edgardo Colon] or Bocerro [Laboy]... or Chupacabra [Juan Matias]."

Based on the controlled drug sales and surveillance tapes of the gang meetings, the FBI arrested Laboy and several other LGD members in January 2000.

**II**.

On October 9, 2000, Laboy pleaded guilty to three counts of heroin distribution for the three controlled purchases he made to CWs.[4]  At the sentencing hearing, the district court heard testimony from an FBI agent and a CW about the inner workings of the LGD and its members' drug dealing.  It also considered the admissions made by other LGD members who had pleaded guilty to heroin distribution, including information about quantities and frequency of sales.  The court examined Laboy's relationship with other LGD members, both through the gang and individually.

The court found, by clear and convincing evidence,[5] that Laboy and other LGD members had "jointly undertaken" various activities, within the meaning of U.S.S.G. § 1B1.3,[6] to advance their collective heroin business.  Because of this cooperation, the court held Laboy accountable for all heroin distributed by other LGD members during the course of the FBI's investigation.  It further found that LGD members had distributed, and thus that Laboy was responsible for, more than one kilogram of heroin.  Finally, it

---

[4]The Government dropped several other charges.  Charges of conspiracy were severed from the proceeding.

[5]The district court was only required to make these findings by a preponderance of the evidence.  See United States v. Lombard, 102 F.3d 1, 4-5, (1st Cir. 1996).  Nevertheless, it chose to apply both standards, apparently to emphasize the strength of the evidence.

[6]See infra Part III.A.

found that Laboy, through his role in the LGD, was an organizer or leader of an "otherwise extensive" organization, under U.S.S.G. § 3B1.1. The court applied a base offense level of 32, with a 4 point adjustment for Laboy's role in the offense, and a three point reduction for acceptance of responsibility. It sentenced him to 168 months in prison, 3 years supervised release and a $300 special assessment.

## III.

On appeal, Laboy offers two arguments: first, that the district court erred in holding him responsible for more than one kilogram of heroin, and second, that it erred in adjusting his sentence for his leadership role in the LGD. We address each of these arguments in turn.

### A. Calculation of Drug Quantity

The district court need only determine drug quantities by a preponderance of the evidence. United States v. Batista, 239 F.3d 16, 21 (1st Cir.), cert. denied, 534 U.S. 850 (2001). We review such determinations for clear error.[7] Id.

---

[7]Appellee argues that since Appellant did not object to the district court's method of drug calculation at sentencing, we should review only for plain error. See, e.g., United States v. Mojica-Baez, 229 F.3d 292, 306 (1st Cir. 2000)(applying plain error standard where objections made at sentencing did not address the issues on appeal). Appellant replies that he could not object at sentencing because the specific method of quantity calculation was revealed only in a subsequent memorandum from the court. Because we find that the district court's quantity calculations meet the clearly erroneous standard in any event, we need not decide the

Laboy first argues that he should be held accountable only for the drug quantities involved in his three sales to CWs and not for quantities sold by other LGD members. Drug quantity determinations are not limited to the amounts involved in the offense of conviction. Rather, a defendant may be held responsible for drug quantities involved in his "relevant conduct." U.S.S.G. § 1B1.3. Such conduct may include a defendant's own acts or the acts of others: the sentencing guidelines provide responsibility for the acts of others in the case of "jointly undertaken criminal activity", which includes any "criminal plan, scheme, endeavor or enterprise undertaken by defendant in concert with others." U.S.S.G. § 1B1.3(a)(1)(B). The guidelines state that a defendant may be held responsible for

> all reasonably foreseeable acts and omissions
> of others in furtherance of the jointly
> undertaken criminal activity, that occurred
> during the commission of the offense of
> conviction, in preparation for that offense,
> or in the course of attempting to avoid
> detection or responsibility for that offense.

Id. In the case of controlled substances, the defendant is responsible for "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that

standard of review issue.

he jointly undertook." U.S.S.G. § 1B1.3, cmt. (n.2).[8] Thus, a drug dealer who engages in criminal activity with others to further their collective interests may be held liable for the quantities of drugs sold by his partners, if those sales were a reasonably foreseeable consequence of the jointly undertaken actions.

This type of liability, however, has its limit: mere knowledge of another's activity is not enough to show liability under U.S.S.G. § 1B1.3. Rather, "the central concept... is foreseeability." United States v. O'Campo, 973 F.2d 1015, 1023 (1st Cir. 1992). The defendant is only responsible for foreseeable conduct within the scope of his own explicit or implicit agreement. See, e.g., United States v. Carrozza, 4 F.3d 70, 76 (1st Cir. 1993)("So as to keep the criminal responsibility within bounds, § 1B1.3 requires sentencing courts to ascertain on an individual basis the scope of the criminal activity that the particular defendant agreed jointly to undertake."); United States v. Innamorati, 996 F.2d 456, 488-89 (1st Cir. 1993)("[E]ach member of a drug conspiracy may be held accountable at sentencing for a different quantity of narcotics, depending on the circumstances of each defendant's involvement."). While a conspiracy charge may

---

[8]"[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993).

encompass all acts by co-conspirators in furtherance of the conspiracy, see Pinkerton v. United States, 328 U.S. 640, 647 (1946), "relevant conduct" is limited to the foreseeable acts resulting from the defendant's particular agreement. Thus, the scope of relevant conduct is "not necessarily the same as the scope of the entire conspiracy." U.S.S.G. § 1B1.3, cmt. (n.2).

The record shows that Laboy was a high-level gang member who fully participated in the LGD's drug trade.[9] He was one of the "heads" of the gang charged with overseeing gang activities designed to protect the LGD's heroin operation. Through his leadership in the LGD he helped to keep other dealers out of LGD "turf," ensuring that only he and his fellow LGD members would be able to deal heroin in the area. He stepped in to supply Flores's customers when the LGD "Lord" was out of town. He had other LGD members sell drugs on his behalf. Indeed, Laboy's actions closely resemble an example from the guidelines:

> Defendant Q, [a] street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable

---

[9]Laboy argues that he had stopped selling heroin and had virtually severed all ties with the LGD by August 1999 and thus cannot be held accountable for any drugs sold after that point. The record, however, does not support this argument. As noted above, see supra note 3, FBI videotapes recorded Laboy's presence at LGD meetings on September 29, 1999 and October 24, 1999. Laboy's participation in these meetings is evidence of his continuing involvement with the LGD after August of 1999.

> under subsection (a)(1)(B) for the quantities
> of drugs sold by the four other dealers during
> the course of his joint undertaking with them
> because those sales were in furtherance of the
> jointly undertaken criminal activity and
> reasonably foreseeable in connection with that
> criminal activity.

U.S.S.G. § 1B1.3, cmt. (n.2, illus. (c)(6)). Given the record of Laboy's cooperation with other LGD members involved in the heroin trade, the district court correctly considered their jointly undertaken criminal activity in determining the quantity of drugs for which Laboy was responsible.

In challenging the drug quantity calculation, Laboy next argues that the district court impermissibly multiplied drug amounts from single sales by the estimated frequency of those sales to arrive at a total of more than one kilogram. Indeed, rote multiplication of quantities from a *single* exchange is, taken alone, an improper method for determining overall drug quantities. See United States v. Rivera-Maldonado, 194 F.3d 224, 233 (1st Cir. 1999). This is especially true where an estimate of quantity is multiplied by an estimate of frequency. Rather, drug quantities must find specific support in the record, and "where significant uncertainty exists, those findings [must] err on the side of caution." Id.

However, when "the amount [of drugs] seized does not represent the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1, cmt.

-11-

(n.12). We have held that, when "it is impossible or impractical to obtain an exact drug quantity for sentencing purposes, a reasoned estimate will suffice." United States v. Morrill, 8 F.3d 864, 871 (1st Cir. 1993); see also United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999)(upholding a "reasoned approximation of drug quantity, well supported by a preponderance of the evidence"); United States v. Rodriguez, 162 F.3d 135, 149 (1st Cir. 1998)(upholding a "reasoned, if not conservative, estimate of the drug quantity involved" in the offense). We have upheld findings that are supported by a preponderance of the evidence and are based on a "conservative approach." U.S. v. Sklar, 920 F.2d 107, 113-14 (1st Cir. 1990). Thus, the mere fact that a district court used estimates to determine drug quantities does not, alone, constitute reversible error.

In making its estimates, the district court looked both at gang activities and at Laboy's direct involvement with various dealers. First, the court accounted for sales by LGD members Kenny Cruz and Roberto Pagan, who worked directly for another LGD "captain," Edgardo Colon. In pleading guilty to conspiracy charges, Cruz admitted that he was directly responsible for 750 grams of heroin. Pagan similarly pleaded guilty, taking responsibility for at least 1000 grams of heroin. These admissions alone account for almost twice the court's one kilogram finding. However, to ensure a conservative estimate, the court reduced the

amounts attributed to Pagan and Cruz to between 542-828 and 427-499 grams respectively.

The court also looked at sales by members of the LGD leadership. Edgardo Colon sold heroin to a CW and gave out his brother Wilberto's beeper number to set up future sales. Another captain, Antonio Santiago, admitted to selling more than 100 grams. The LGD "Lord," Luis Flores, sold heroin to a CW, tried to recruit the CW to sell heroin on his behalf, and admitted to selling "rock" 24 hours a day. He stated at the September 26 LGD meeting: "My life... all I do is sell my drugs...." All told, CWs purchased 108 grams of heroin from LGD members in controlled buys, undoubtedly a small fraction of what its members were distributing to other sources.

This extensive record of individual sales by LGD members, added to Laboy's own activities, supports attributing one kilogram of heroin to Laboy. Indeed, it is a conservative estimate. In opposition, Laboy contends that some of the testimony and admissions used by the district court in making its determination were unreliable. However, "[t]he appraisal of amount depends on inference drawing and perhaps credibility and we are not only loath but forbidden to substitute our own *de novo* assessment for that of the judge who tried the case and heard the evidence first hand." U.S. v. Picanso, 333 F.3d 21, 27 (1st Cir. 2003). Thus we find no

error in the court's decision to hold Laboy responsible for one kilogram of heroin.

**B. Role Adjustment**

Laboy also argues that the district court erred in enhancing his sentence by finding that he was an "organizer or a leader of a criminal activity that involved five or more participants or was otherwise extensive" under U.S.S.G. § 3B1.1. In applying U.S.S.G. § 3B1.1, "a district court must make both a status determination - a finding that the defendant acted as a leader or organizer of the criminal activity - and a scope determination - a finding that the criminal activity met either the numerosity or extensiveness benchmarks established by the guidelines." United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995). Determining the defendant's role in the offense is necessarily a "fact-specific task." Id. at 110. We review the district court's factual findings for clear error, giving "due deference to the district court's application of the guidelines to the facts." United States v. Joyce, 70 F.3d 679, 681 (1st Cir. 1995). We review its legal interpretation of the guidelines de novo. See, e.g., United States v. Brennick, 337 F.3d 107, 110 (1st Cir. 2003).

As with the determination of drug quantities, the court may draw on all "relevant conduct" when determining whether the defendant was an "organizer or leader" for the purposes of the

-14-

guidelines.  See, e.g., United States v. Ruiz-Batista, 956 F.2d 351, 353-54 (1st Cir. 1992).  The guidelines direct the sentencing court to a variety of factors in making this determination.

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. (n.4).  The record demonstrates that Laboy engaged in several of these activities.  He attended LGD meetings and was identified as a leader in the gang, ranking just below the LGD "Lord."  Lower level gang members were directed to take their problems to Laboy and the other "heads" of the LGD.  The LGD claimed a share of heroin proceeds to be placed in the "fundle." Laboy had several gang members selling drugs on his behalf.  He even attempted to recruit at least one CW to sell heroin for him. Based on this record, we cannot say that the district court clearly erred in finding that Laboy was a leader or organizer of the LGD.

While conceding that the district court may look to all "relevant conduct" when determining the "organizer" or "leader" elements, appellant would have us limit the "five or more participants" and "otherwise extensive" elements solely to the

offenses of conviction.[10]  In essence, appellant argues that the numerosity/extensiveness requirement must be satisfied only by people directly involved in the three drug sales to which Laboy pleaded guilty, and not by the people or organization that contributed to the "relevant conduct" surrounding those specific offenses.

Our precedent does not support such an approach.  Rather, we have said that the extensiveness requirement depends on "the totality of the circumstances, including... the width, breadth, scope, complexity, and duration of the scheme."  Deitz, 950 F.2d at 53.  On several occasions, we have found the extensiveness requirement met by the relevant conduct surrounding the offense of conviction.  See, e.g., Tejada-Beltran, 50 F.3d at 113 (finding that a scheme to smuggle illegal immigrants met the extensiveness

---

[10]The "five or more participants" and "otherwise extensive" elements are alternative means of finding the required scope under § 3B1.1.  The sentencing court need only find one or the other, not both.  See U.S. v. Deitz, 950 F.2d 50, 53 (1st Cir. 1991)(finding that the "otherwise extensive" element is distinct from and does not necessarily incorporate the "five or more participants" element); Tejada-Beltran, 50 F.3d 105, 113 (1st Cir. 1995)("[T]he criminal activity must meet either the extensiveness or the numerosity benchmark, not necessarily both....").  Nevertheless, the district court found that both elements were satisfied: "[t]he 'five or more participants' standard is met by reviewing the attendees at gang meetings, who plainly facilitated the distribution of drugs at the direction of the President and Captains at LGD. The 'otherwise extensive' standard is met by the complexity of the organizational structure of the LGD, its reach into the community etc." United States v. Flores, 230 F. Supp.2d 138, 150 (D. Mass. 2002).

requirement because of "the breadth of the activities, whether measured in terms of duration, number of clients, or geographic reach...."); United States v. Graciani, 61 F.3d 70, 76 n.7 (1st Cir. 1995)(finding the extensiveness requirement met by "a ledger that established a wide-ranging pattern of drug trafficking activities, and a trash bag containing thousands of empty vials used to package crack cocaine.").

Further, the commentary to the guidelines does not support appellant's reading. The introductory commentary to Chapter 3, part B simply states that the "defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct)... and not solely on the basis of elements and acts cited in the count of conviction." U.S.S.G. Ch.3, Pt.B, intro. cmt. It does not distinguish between any of the various elements that may lead to a role in the offense adjustment. Further, the commentary to § 3B1.1 refers to determining whether an "organization" involved in a crime, rather than the crime itself, is otherwise extensive. U.S.S.G. § 3B1.1, cmt. (n.3). It also states that the sentence should increase with "the size of a criminal organization," without expressly limiting extensiveness or complexity to the crime of conviction. U.S.S.G. § 3B1.1, cmt. (backg'd.). Thus, both our precedent and the commission's commentary indicate that district courts may consider relevant

conduct beyond the crime of conviction when determining the numerosity and extensiveness requirements.

The relevant conduct surrounding Laboy's heroin sales included "five or more participants" and demonstrated that the LGD was an "otherwise extensive" organization under U.S.S.G. § 3B1.1. The LGD consisted of more than 20 members, organized to protect gang "turf" and prevent any other gangs from competing with their heroin "business" in the Lawrence area. Lower level gang members, or "soldiers," were required to go on "missions" to carry out gang objectives. Members pooled funds from their individual drug sales to ensure that LGD members could be bailed out of jail and have access to firearms. Finally, the LGD had a clear hierarchy, with Luis Flores as the "Lord" of the gang, and several "captains", including Laboy, who collectively directed gang activity. This record is more than sufficient to support a determination that the LGD was "otherwise extensive" or included "five or more participants."

## IV.

For the foregoing reasons, we find no error in the district court's sentence.

Affirmed.

-18-