# United States Court of Appeals
## For the First Circuit

No. 12-1203

UNITED STATES OF AMERICA,

Appellee,

v.

KATHY VÁZQUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Torruella, Thompson and Kayatta,
Circuit Judges.

Allison J. Koury, by appointment of the court, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom
John P. Kacavas, United States Attorney, was on brief for appellee.

July 18, 2013

**KAYATTA, <u>Circuit Judge</u>.** Kathy Vázquez sold crack cocaine to a confidential informant. A police search of her home later turned up powder cocaine, cash, and drug-dealing paraphernalia. Based on this evidence, Vázquez was convicted of three drug-related offenses and sentenced to 78 months' imprisonment.

On appeal, Vázquez challenges three different steps in the process that brought her to a prison cell. First, she claims that her consent to the FBI's warrantless search of her home was secured by a false claim that a lawful, warrantless search of her home would ensue without her consent, rendering the evidence discovered through that search inadmissible at trial. Second, she argues that the district court should have instructed the jury on the defense of duress. Finally, she asserts that the district court miscalculated her sentence under the United States Sentencing Guidelines by assigning her responsibility for too much crack cocaine, as well as for a gun possessed by her co-conspirator before the beginning of the charged conspiracy.

We find that the district court erred in failing to determine whether there were reasonable grounds to support the claim made to Vázquez that a lawful, warrantless search of her home would ensue without her consent. Otherwise, we reject Vázquez's arguments on appeal. As explained more fully below, we therefore affirm Vázquez's conviction on two of the three offenses, vacate

her conviction on the third, and remand the case for further proceedings consistent with this opinion.

## I. Background

In the fall of 2007, the Federal Bureau of Investigation received a tip from a confidential informant that Vázquez and her boyfriend, Bernado "Junito" Soto, were involved in the distribution of illegal drugs. On December 5, 2007, the FBI arranged for that informant to make a controlled buy of crack cocaine from Vázquez and Soto. The informant phoned Vázquez and agreed to meet her inside a local Walgreens to purchase 14 grams of crack cocaine from her, pre-bagged for resale. The sale occurred as planned, while Soto waited outside. After Vázquez and the informant exited the store together, the informant spoke to Soto for a few minutes about what Soto wanted done with a gun that he had previously loaned to the informant's boyfriend.

The next day, the informant made a second controlled buy of another 14 grams of crack cocaine from Vázquez and Soto, this time at Vázquez's home. The three chatted about various aspects of their drug dealing activities, including a scheme to smuggle liquid cocaine from the Dominican Republic into the United States.

The last controlled buy was supposed to occur on January 16, 2008. The informant again visited Vázquez's home, seeking to purchase crack cocaine, but this time Vázquez and Soto told her

that they only had powder cocaine in stock and that it was not good for cooking into crack.

Later that same day, New Hampshire Probation and Parole, working in coordination with the FBI, arrested Soto on a parole violation in a parking lot near a gym in Nashua. Thereupon, the FBI sought and received Vázquez's permission to search her home, where Soto had been staying. The search turned up two plastic bags of powder cocaine; a number of unused plastic bags; approximately $4,620 in cash; a Western Union receipt dated three days prior indicating that Vázquez had sent money to the Dominican Republic; a digital scale; two kinds of cutting agent used to prepare cocaine for sale; and a filter for cutting cocaine.

Vázquez was subsequently indicted on four separate counts: (I) Conspiracy to Distribute Cocaine and Cocaine Base (crack) beginning on December 5, 2007, and continuing through January 16, 2008; (II) Distribution of Cocaine Base on December 5, 2007; (III) Distribution of Cocaine Base on December 6, 2007; and (IV) Possession of Cocaine with Intent to Distribute on January 16, 2008. See 21 U.S.C. § 841(a)(1) & 846 (2006). Prior to trial, Vázquez moved to suppress the evidence seized in the search of her home, pressing the argument that her consent had been secured by a false claim of authority to search. After an evidentiary hearing, the district court denied her motion to suppress. Vázquez was

ultimately convicted on the first, third, and fourth counts, and was acquitted on the second count.

At sentencing, the district court calculated Vázquez's recommended sentence under the United States Sentencing Guidelines by attributing to her approximately 100 grams of crack cocaine, which gave her a base offense level of 26. See U.S.S.G. § 2D1.1(c)(6). The court also found that a firearm was possessed in connection with the charged conspiracy and accordingly enhanced Vázquez's base offense level by two, raising it to 28. See id. at § 2D1.1(b)(1). In combination with Vázquez's criminal history category of I, these findings yielded a recommended sentence of 78 to 97 months. The court sentenced Vázquez to a 78-month term of imprisonment.

## II. Analysis

### A.   The Search of Vázquez's Home

The Fourth Amendment forbids law enforcement from searching a suspect's home without a warrant unless the search falls under "one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). Consent to the search is one such exception. See id.

For consent to a search to be valid, however, the government must prove by a preponderance of the evidence that the consent was uncoerced. See United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008). The presence of coercion is a question of fact based on the totality of the circumstances, including "the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place." United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989) (citing Schneckloth, 412 U.S. at 227, 229, 247)). Importantly, courts must also consider "any evidence that law enforcement officers' ... misrepresentation prompted defendant's acquiescence to the search." Vanvliet, 542 F.3d at 264-65 (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)).

As we will explain, this is a case in which the record is clear that a representation by the FBI prompted Vázquez's acquiescence to the search. Specifically, the FBI obtained Vázquez's consent to search her home by telling her that a warrantless search of her home would be conducted without her consent. The central questions thus posed for the district court were whether the representation was correct and, if not, whether the consent was invalid and the search unlawful. In answering these rather difficult questions, the district court found itself

-6-

unable to determine whether the representation used to procure Vázquez's consent was false. Nevertheless, the court ruled that, as long as the FBI agents acted in "subjective good faith" in claiming that a warrantless search could be conducted without Vázquez's consent, her consent validated the search.

On appeal from that ruling, we review the district court's conclusions of law de novo and its findings of fact for clear error. See Ornelas v. United States, 517 U.S. 690, 696-98 (1996). In so doing, we find that reasonableness, rather than subjective good faith, is the controlling legal standard; consent procured by a claim that a search will ensue anyhow is valid only if the claim is based on a reasonable assessment of the facts under the applicable law. Because the district court did not determine whether the FBI agents' representation was correct based on a reasonable assessment of the facts, because the record does not dictate an answer to this question, and because admission of the results of the search at trial was not harmless as to Count IV, remand is required. Our reasoning follows.

1. **Procuring Vázquez's Consent**

Once Soto was arrested, two FBI agents dressed in plain clothes approached Vázquez, identified themselves, and asked if she would have a cup of coffee with them at a nearby Dunkin' Donuts. Neither agent displayed firearms or handcuffs, touched Vázquez, or

told her that she was under arrest.  Vázquez agreed to join them for coffee.

Inside the Dunkin' Donuts, the agents ordered Vázquez a cup of coffee and allowed her to use the restroom unescorted while they secured a table.  Vázquez later joined the agents at the table.  She did not appear upset or unsettled.  One of the agents asked Vázquez for her cooperation in their investigation, explaining that Soto had been arrested for a parole violation.

As it became clear that Vázquez was not willing to cooperate with the investigation, the agents changed tack and attempted to obtain Vázquez's consent to a search of her home. Vázquez asked the FBI agents if they had a search warrant for her home.  In response, they told her that, while they did not have a warrant, New Hampshire Probation and Parole had the authority to search her home without her consent, and was going to do so.  The agents based that assertion on information communicated to them by New Hampshire Probation and Parole, which had informed the FBI earlier in the day that it intended to search Soto's residence-- assumed to be the same as Vázquez's--after his arrest.[1]

_____

[1]The government's brief claims that the FBI agents "merely provided the defendant with truthful information that another law enforcement agency believed that it had the right to search on a ground other than consent."  Says the government, "Special Agent Schneider made no statement suggesting his own view on this authority."  Special Agent Schneider, however, testified flatly to the contrary: "I'm sure I told her that probation and parole has the authority to conduct a search at that residence."  In a similar

The FBI agents explained to Vázquez that if she consented to an authorized search, she could help the agents to separate her property from Soto's and thereby distance herself from his illegal activities. Vázquez expressed concern that the search might make a mess of her house, and asked a few other questions about the process. After the officers explained to her how the search would proceed, and then reviewed with her a written consent form, she signed the form granting consent to search her home.

The entire conversation in the Dunkin' Donuts lasted between 15 and 20 minutes. Having obtained Vázquez's consent, the FBI agents drove to her home, where they met New Hampshire Probation and Parole officers. Together, the agents and officers jointly searched the premises, discovering the evidence described above.

Three aspects of the discussion between the FBI agents and Vázquez are especially pertinent. First, nothing in the record can be reasonably understood to suggest that Vázquez would have consented to the search but for the agents' assertion that a search by New Hampshire Probation and Parole would ensue anyway. Having first refused to cooperate generally, her initial response to the agents' request for consent to search was to ask if there was

vein, the government suggests that the agents merely allowed that a search without consent was "likely." As the district court expressly found, however, the agents told Vazquez "that the state had the authority to search and in fact were going to search."

already a warrant; <u>i.e.</u>, whether a search was going to happen either way. She only consented to the search after she was assured that a search was inevitably going to occur, even without a warrant; <u>i.e.</u>, there was no possible upside to refusing consent. Second, while the agents' confident and professional behavior likely enhanced the credibility of any assurances they conveyed, nothing in the record suggests that what they said or did was otherwise coercive or in any way inappropriate. Third, there is no basis for reversing as clear error the district court's determination that the agents honestly believed that New Hampshire Probation and Parole officers could conduct a lawful search without Vázquez's consent.

**2. New Hampshire Probation and Parole's Authority to Search Vázquez's Home**

On appeal, the government correctly observes that, if New Hampshire Probation and Parole did indeed have the right to conduct the search of Vázquez's home without her consent, then the issue of her consent would be moot. That is so because the consent secured no earlier or broader search than could have been conducted lawfully were the claim of authority correct. Building on this observation, the government then claims that Vázquez never challenged the independent authority of New Hampshire Probation and Parole to conduct the search. Therefore, reasons the government, we can affirm the denial of the motion to suppress on that

alternative ground, rendering the consent issue effectively moot.

The flaw in this mootness argument is that Vázquez did fairly challenge the independent authority of New Hampshire Probation and Parole to conduct a search of her home. Indeed, her argument was precisely that because New Hampshire Probation and Parole did not have such authority, the agents should be found to have employed a false claim to procure her consent. To suggest that Vázquez somehow artificially limited this argument in a manner that left unchallenged the authority of New Hampshire Probation and Parole as an independent basis for sustaining the validity of the search is to suggest that the parties and the district court knowingly engaged in a pointless hearing.

Certainly, the district court did not view the authority of New Hampshire Probation and Parole as an unchallenged, alternative basis for denying the motion to suppress. Rather, the court expressly avoided deciding whether New Hampshire Probation and Parole actually had the authority to search Vázquez's home or whether it was reasonable to think that they did have such authority. The district court explained: "I don't think that's the turning point." Instead, the district court determined that, because the FBI agents believed that a search could be conducted anyway, and because the FBI agents did not otherwise coerce Vázquez's consent, the consent validated the search even if New

Hampshire Probation and Parole could not have lawfully conducted a search.[2]

It is, indeed, unclear whether New Hampshire Probation and Parole had the right to search Vázquez's home. One suggested basis for the search -- the arrest warrant issued for Soto due to his violation of his parole -- could not have sufficed. The warrant granted "the limited authority to enter [the] dwelling in which [Soto] live[d] when there [was] reason to believe [that he was] within." Payton v. New York, 445 U.S. 573, 602 (1980). Since Soto had already been arrested at another location, the arrest warrant did not authorize a subsequent search of his home as a matter of law. Cf. United States v. Graham, 553 F.3d 6, 15 (1st Cir. 2009) ("Although the officers possessed a valid arrest warrant, this warrant only permitted them to seize Graham and did not, standing alone, authorize the search of the bedroom where Graham was found.").

As a possible alternative justification for search without consent, that leaves only the fact that, as a condition to his parole, Soto had agreed that New Hampshire Probation and Parole could search his residence at any time. This kind of probation condition can so diminish a probationer's expectation of privacy

_____

[2]To the extent that the government is also arguing that it be allowed to supplement the record on remand, the district court retains discretion in structuring the remand proceeding.

that it would permit police officers to search his residence without a warrant based only on a reasonable suspicion of criminal conduct, see United States v. Knights, 534 U.S. 112, 119-121 (2001), which law enforcement clearly had here.[3]   However, Vázquez's case differs from Knights in several important ways: Soto's parole agreement used different language than Knights's,[4] Soto had already been arrested before the search occurred,[5] and Soto might not have been residing in Vázquez's home.

Because the district court did not reach the question of whether New Hampshire Probation and Parole really did have the authority to search Vázquez's home, we have no analysis of whether the terms of Soto's probation agreement would permit a warrantless search of his home based only on reasonable suspicion, nor whether such a search would be permissible following his arrest. Importantly, we also have no factfinding on whether Soto resided with Vázquez and, if not, what the various officers knew that might have reasonably led them to believe that Soto resided with Vázquez.

_____

[3]Although some states have passed statutes giving law enforcement the power to search the homes of persons released on parole without any cause at all, see, e.g., Cal. Penal Code § 3067(b)(3); see also Samson v. California, 547 U.S. 843 (2006) (upholding such statutes against Fourth Amendment challenge), we cannot locate a similar provision under New Hampshire law, see N.H. Rev. Stat. §§ 504-A:1-15; 651-1A:1-25 (2013), and the government does not point us to one.

[4]See, e.g., Graham, 553 F.3d at 15-18.

[5]See, e.g., United States v. Trujillo, 404 F.3d 1238, 1242-43 (10th Cir. 2005)

-13-

Without further fact-finding and analysis from the district court, we cannot decide at this juncture whether the parole condition was a lawful basis for New Hampshire Probation and Parole to search Vázquez's home. Therefore, we must assume for purposes of this appeal that New Hampshire Probation and Parole officers did not have the right to search Vázquez's home absent her consent.

### 3. "Subjective Good Faith" Versus "Reasonableness"

Given the foregoing, the question posed is whether Vázquez's consent can justify the search if secured by a sincere, but erroneous representation that a search would ensue anyhow. The otherwise well-developed case law on consensual searches secured by the looming promise of a non-consensual search marks the boundaries of our inquiry, but provides no clear answer to the specific question posed here. The law is clear, for example, that consent to a search is invalid if given only because of an officer's knowingly false assurance that there will soon be a lawful search anyway. Bumper v. North Carolina, 391 U.S. 543, 548 (1968); United States v. Miller, 589 F.2d 1117, 1132 (1st Cir. 1978); 2 Wayne R. LaFave, et al., Criminal Procedure § 3.10(b), at 410-11 (3d ed. 2007). Similarly, the law is almost as clear that consent to a search is not invalid merely because it is secured by an officer's accurate assurance that there will soon be a lawful search anyway. See United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003); United States v. Lee, 317 F.3d 26, 33 (1st Cir.

-14-

2003); <u>Twomey</u>, 884 F.2d at 52 (fact that warrant would have issued rendered it unnecessary to decide whether and when honest, but mistaken, representation implying that warrant could be obtained invalidated consent); <u>see also</u> <u>United States</u> v. <u>Wilkinson</u>, 926 F.2d 22, 25 (1st Cir. 1991), <u>overruled on other grounds</u>, <u>Bailey</u> v. <u>United States</u>, 516 U.S. 137 (1995) (the officers accurately stated the likely consequences if the suspect refused to consent to a search); <u>Robbins</u> v. <u>MacKenzie</u>, 364 F.2d 45, 49-50 (1st Cir. 1966) ("Bowing to events, even if one is not happy about them, is not the same thing as being coerced."). In short, the law rejects consent secured by knowingly false representations while at the same time seeing no reason to deter officers from securing convenient and prompt consensual access by conveying accurate information to a recipient.[6]

This case falls between these boundaries because, as noted, we have neither knowing falsity nor a determination of accuracy. While there is no controlling precedent on point, the applicable principles and analogous case law nevertheless convince us that the agents' subjective good faith is not enough. The Fourth Amendment by its express terms demands that searches be "reasonable," not merely based on good intentions. "If subjective

---

[6]Using the concept of "coercion" to distinguish these two situations is something of a misnomer. In each case, the same amount of pressure is brought to bear on the person's will. The distinction resides more in concepts of knowing misrepresentation, or "trickery." <u>See</u> <u>Vanvliet</u>, 542 F.3d at 264.

-15-

good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." Beck v. Ohio, 379 U.S. 89, 97 (1964). Law enforcement officers face varied and ambiguous situations in the course of maintaining the order necessary to make civil society possible. They are entitled to err in assessing the facts, but "the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions . . . ." Brinegar v. United States, 338 U.S. 160, 176 (1949).

The government's position, that the subjective good faith of its officers is enough to sustain the validity of consent as an independent justification for a search, overlooks the compelling potency of a representation that a search is imminent even without consent. When law enforcement officers seek consent to search a person's home without making such a representation, the person giving the consent can reasonably believe that she has a choice. Such consent, unless otherwise coerced, stands on its own as an independent basis for sustaining the validity of the search. See Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973). Conversely, "'[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.'" Id. at 234 (quoting Bumper, 391 U.S. at 550). Consent pried loose by such a claim of authority is

-16-

merely acquiescence. As such, it serves poorly as an independent basis for sustaining the validity of the search. Rather, its force is largely derivative, neither adding to nor subtracting from the reasonableness of the representation of inevitability used to secure the consent. Accordingly, if we were to allow consent to validate a search secured by an authoritative pronouncement of inevitability where the officers act only in subjective good faith, and not reasonably, we would largely eliminate any requirement that reason necessarily play a role in securing the search.

Illinois v. Rodríquez, 497 U.S. 177 (1990), supports our conclusion that reasonableness, not merely subjective good faith, is the standard that the government must meet. In Rodríquez, the police conducted a warrantless search based on the consent of a person who appeared to have, but did not in fact have, authority over the premises. See id. at 179-82. The defendant argued that without valid consent from an authorized party, the search was unlawful. See id. at 180. The Supreme Court rejected that argument, holding that no Fourth Amendment violation occurs when the police reasonably, though erroneously, believe that the person who has consented to their entry has authority over the premises. See id. at 185-86.

For present purposes, the important point is that in rejecting the argument that the police must be correct on the facts, the Court also made clear that an honest belief in the

-17-

validity of the consent was insufficient: "As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard . . . .'" Id. at 188 (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)). The Court emphasized that "what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." Id. at 185-86; cf. Hill v. California, 401 U.S. 797, 803-04 (1971) ("The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong, as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search.").

In Rodríquez, the justification for the search was consent given by a person who law enforcement believed was authorized to do so. Here, the justification was consent secured by law enforcement's announced belief that a nonconsensual search would ensue anyway. We see no reason why reasonableness need not characterize the officers' beliefs in both circumstances. Otherwise, unreasonable but honest officers could parlay unlawful grounds for conducting searches into lawful searches merely by using the prospect of the unlawful search as a means of securing acquiescence.

Our holding is compatible with the few decisions we have found that have addressed slight variants of the issue before us. Three cases have held that a law enforcement officer's honest but mistaken claim of lawful authority to search invalidated the defendant's consent and required exclusion of the resulting evidence. In all three cases, the police lacked an objectively reasonable factual basis for their assertions--their claims of lawful authority were wrong even on the facts as the police understood them. See United States v. Molt, 589 F.2d 1247, 1251-52 (3d Cir. 1978) (consent vitiated when customs agents innocently but incorrectly asserted the legal authority to conduct a warrantless search of a business's records); Cooper v. State, 587 S.E.2d 605, 612-13 (Ga. 2003) (consent vitiated when police officer unintentionally misrepresented to the defendant that he was required to submit to a warrantless blood test); Lobania v. State, 959 S.W.2d 72, 73-74 (Ark. Ct. App. 1998) (consent vitiated when police translator innocently but incorrectly mistranslated an officer's request to search as an officer's claim of authority to search). One case of which we are aware held that an honest but mistaken claim of lawful authority to search did not vitiate the defendant's consent. In that case, the police had an objectively reasonable basis for their claim; it just turned out that they were mistaken about the underlying facts. See United States v. Richard, 994 F.2d 244, 252 (5th Cir. 1993) (consent valid when police

officers honestly but inaccurately informed the subject of the search that her boyfriend had already agreed to allow them to search her motel room).

The conclusion that consent is invalid if procured by an officer's unreasonable claim that a lawful search will ensue anyway imposes no unusual burden on law enforcement officials. In many walks of life, agreements given in justified reliance on false representations are voidable. See Restatement (Second) of Contracts § 164(1) (1981). (Indeed, in an ordinary contract case, even reasonableness in making the representation might not save the deal. Id.) Law enforcement officials, moreover, are knowledgeable in assessing whether the facts render a search lawful. In this context, it is no great demand to expect that they know the law and themselves be reasonable in assessing the facts when they procure consent to search a person's home by assuring the person that a lawful search will ensue anyway.

In sum, by failing to determine whether the claimed authority to search was based on a reasonable assessment of the facts, the district court may have erred in its ultimate decision denying the motion to suppress.

### 4. Harmless Error Analysis

Even if admission of the results of the search may have been error, we need not vacate and remand if, beyond a reasonable

doubt, the admission of the evidence could not have impacted the result below.  Neder v. United States, 527 U.S. 1, 7 (1999); Fed. R. Crim. P. 52(a); see also United States v. Crooker, 688 F.3d 1, 9 (1st Cir. 2012); United States v. Jiménez, 419 F.3d 34, 41-42 (1st Cir. 2005).

When we apply the harmless error analysis, we place the burden on the government to show "that the supposed error did not affect the outcome of trial." Jiménez, 419 F.3d at 42.  We conduct "a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue."  United States v. Castellini, 392 F.3d 35, 52 (1st Cir. 2004) (quoting United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993)) (internal quotation marks omitted).

We begin with Count I, Conspiracy to Distribute Cocaine and Cocaine Base (crack) beginning on December 5, 2007 and continuing through January 16, 2008.  See 21 U.S.C. §§ 841(a)(1) & 846.  The evidence discovered inside Vázquez's home, where Soto was at least temporarily staying, was highly incriminating, but it was also merely cumulative of the substantial additional evidence offered at trial indicating that Vázquez and Soto had been working

-21-

together to sell crack cocaine during the period in question. Aside from the materials found inside Vázquez's home, the government also presented evidence that Soto and Vázquez together sold crack cocaine to the confidential informant at their home on December 6; that they planned to sell her crack cocaine once more at Vázquez's home on January 16; and that they engaged in multiple recorded conversations during which they both discussed their joint drug-dealing venture in great detail.[7] Based on this evidence, we are convinced that the jury would still have convicted Vázquez on the first count even if the evidence from the search of her home had been suppressed.

As to Count III,[8] Distribution of Cocaine Base on December 6, 2007, see 21 U.S.C. § 841(a)(1), the evidence found in Vázquez's home was superfluous. The government presented both witness testimony and recorded conversations indicating that Vázquez sold 14 grams of crack cocaine to the confidential informant on December 6. Nothing from the search of Vázquez's home was needed to support this conviction.

---

[7]The government also presented evidence that the two sold crack to the informant on December 5, but the jury acquitted Vázquez on the charge related to that transaction. In any event, the evidence of the December 5 sale is merely cumulative, since there was substantial additional evidence that Vázquez and Soto were conspiring together to distribute crack cocaine.

[8]As noted above, the jury acquitted Vázquez on Count II.

-22-

Finally, in regard to Count IV, Possession of Cocaine with Intent to Distribute on January 16, 2008, see 21 U.S.C. § 841(a)(1), the prosecution's case was based almost entirely on the cocaine that the FBI agents had seized from inside Vázquez's home. The only other evidence supporting Count IV was the confidential informant's testimony at trial that Vázquez had mentioned to her on January 16 that she and Soto had some powder cocaine in their possession. We are not convinced "beyond a reasonable doubt" that the jury would still have convicted Vázquez on Count IV based solely on this stray and unsubstantiated remark. Neder, 527 U.S. at 7 (internal quotation marks omitted). Accordingly, a remand will be necessary.

5. **Guidance on Remand**

Given the relative novelty of the issues as framed in a case involving a joint law enforcement exercise and the assertion of an independent and a derivative ground for the warrantless search, we address three additional questions that necessarily will arise below as a foreseeable product of our holding.

First, to what determination does the assessment of reasonableness apply: the determination of the facts, or the determination of what the law is, based on those facts? As at least two other sister circuits have noted, Rodríguez permits warrantless searches based only on a reasonable mistake of fact, not on a mistake of law. See United States v. Salinas-Cano, 959

-23-

F.2d 861, 865-66 (10th Cir. 1992); United States v. Whitfield, 939 F.2d 1071, 1073-75 (D.C. Cir. 1991); see also United States v. Harrison, 689 F.3d 301, 309-10 (3d Cir. 2012). In other words, Rodríguez "applies to situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be." Whitfield, 939 F.2d at 1074. Rodríguez does not permit an officer to search if his mistake is about the law -- for instance, if he mistakenly believes that the Fourth Amendment authorizes a search when in fact it does not, even based on the facts as he understands them.

Second, who must have been reasonable in assessing the facts, the FBI agents who told Vázquez that New Hampshire Probation and Parole could and would search, or the state officers who so told the FBI? On the one hand, agents working in a team should be able to rely on facially plausible statements made by their colleagues without having to conduct due diligence on their own. On the other hand, it would create perverse incentives if unreasonable judgments by one officer directly involved in the arrest and search could be laundered by transmission through another officer as ipse dixit. The answer that best balances the considerations in this particular case is that the FBI agents were entitled to supplement their own knowledge of the facts by relying on the judgments of the state officers concerning the facts, provided that those judgments were themselves reasonable. Cf.

-24-

<u>United States</u> v. <u>Hensley</u>, 469 U.S. 221, 231 (1985) ("[W]hen evidence is uncovered during a search incident to an arrest in reliance on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest."). <u>See generally</u> <u>United States</u> v. <u>Ramirez</u>, 473 F.3d 1026, 1032-37 (9th Cir. 2007) (describing "collective knowledge" doctrine).

Third, and perhaps ironically in view of the manner in which the issues were prioritized below, our ruling renders Vázquez's consent irrelevant in this particular case because the threatened search by New Hampshire Probation and Parole used to secure consent was actually conducted simultaneously and co-extensively with the consented search. If that search by New Hampshire Probation and Parole was valid, then as the government argued below, there is no need to rely on Vázquez's consent. Conversely, if that search was unlawful on its own terms, it would only be because the facts as reasonably perceived by the officers did not as a matter of law justify the warrantless search. The consent here is thus truly derivative, and drops out of the equation altogether in determining the lawfulness of this particular search.

On remand, the district court will therefore need to decide whether the facts as reasonably understood by the officers and agents at the scene gave them the authority to search Vázquez's

residence without Vázquez's consent. If so, the search was lawful. If not, the consent would not have validated the search because it would have been secured as a result of either an unreasonable assessment of the facts or a misapprehension of the law.

## B. The Requested Jury Instruction on Duress

Vázquez's second claim of error challenges the district court's refusal to instruct the jury on the defense of duress. Duress is a common law defense that excuses criminal conduct if the defendant violated the law only because she was unlawfully threatened by another person with death or serious bodily injury. See United States v. Bailey, 444 U.S. 394, 409-10 (1980).

At the close of trial, Vázquez asked the district court to include a duress defense in its charge to the jury. She emphasized that Soto was a member of the "Ñetas," a prison gang that originated in Puerto Rico but had since acquired thousands of members across the United States, including in New Hampshire, and which has been involved in drug trafficking, gun violence, and witness intimidation. She also noted that Soto had access to a gun, and that she was particularly fearful of firearms because she had witnessed her father shoot her mother when she was a child.

Vázquez recounted that Soto had told her about the Ñeta gang's rules and that his gang-member friends had shared stories "of what they do to people [who] . . . snitch." Although Soto

-26-

never threatened her, and she did not believe that he would have hurt her himself, Vázquez felt that she had been implicitly threatened that other Ñeta gang members might harm her or her children if she attempted to go to the police. Allegedly, she only participated in the scheme in order to protect herself and her children.

The district court was unmoved. It declined Vázquez's request for a duress instruction, citing a lack of evidence in the record to support that theory of defense. Vázquez timely preserved her position by objecting to the omission of the instruction before the jury retired.

On appeal, we review de novo whether the defendant made a threshold showing that the record evidence, construed in her favor, supported her requested instruction. United States v. Baird, 712 F.3d 623, 627 (1st Cir. 2013).[9] In this case, it is clear that Vázquez has not made such a showing.

First, the threat she cites was hardly immediate, or even imminent. Rather, it was no more than a "vague threat of future

_____

[9]If the evidence does support the requested instruction, we then move to a three-part test, also conducted de novo, which determines whether the district court's refusal to give the instruction constituted reversible error. According to that three-part test, we vacate the defendant's conviction if her requested instruction was: "(1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present [her] defense." Baird, 712 F.3d at 627.

harm," which is insufficient to support a duress instruction. United States v. Arthurs, 73 F.3d 444, 450 (1st Cir. 1996); see also United States v. Bello, 194 F.3d 18, 27 (1st Cir. 1999). Moreover, the inferred threat against "snitches" can be disregarded. In a case of duress, the relevant threat is that which "caused the actor to engage in conduct violating the literal terms of the criminal law." Bailey, 444 U.S. at 409. Vázquez is charged with violating the laws criminalizing the sale of cocaine, not with failing to report those crimes.

Second, even if we were to accept the notion that Vázquez might have construed an inferred threat against "snitching" to be the equivalent of a threat of harm for not actively committing the crime, such a subjective belief would not constitute a "well-grounded" fear. Bello, 194 F.3d at 27. She needed to produce evidence of threats that would have caused "a defendant of ordinary firmness and judgment" to believe that she would be in immediate danger should she not commit the criminal acts. United States v. Castro-Gómez, 360 F.3d 216, 219 (1st Cir. 2004). The same principle negates Vázquez's claim that the implicit threat had a more powerful effect on her due to her past traumatic experiences with firearms--our objective analysis does not permit consideration of special factors unique to this particular defendant.

Finally, there was no evidence to suggest that Vázquez lacked the opportunity to escape or frustrate any threat against

-28-

her.  See Bello, 194 F.3d at 27.  Vázquez testified that Soto "was always around" at home and that the Ñetas had a presence "all over the place," making it extremely difficult for her to turn Soto over to the authorities.  But even granting the improbable notion that between December 5 and January 16, Vázquez did not have just a few minutes in private when she could have contacted the police, there is nothing to suggest that she could not have simply terminated her romantic and professional relationships with Soto in order to extricate herself from the drug-dealing business.  Cf. Bailey, 444 U.S. at 410 (no duress defense is available "if there was a reasonable, legal alternative to violating the law").

For these reasons, the evidence at trial, construed in Vázquez's favor, could not have supported a finding of duress.  Accordingly, the district court did not err in refusing to instruct the jury on the elements of the defense.

## C.    The Calculation of Vázquez's Guidelines Sentence

Finally, Vázquez claims that the district court miscalculated her sentence under the United States Sentencing Guidelines.[10]

---

[10]At a sentencing hearing, the court may use evidence seized in violation of a defendant's Fourth Amendment rights so long as the police did not intentionally violate the Fourth Amendment in order to increase the defendant's sentence.  See United States v. Larios, 593 F.3d 82, 87 (1st Cir. 2010); United States v. Acosta, 303 F.3d 78, 86 (1st Cir. 2002).  Even if the district court determines on remand that Vázquez's consent to the search of her home was invalid and so suppresses the evidence obtained therein,

The standard practice when imposing a sentence is for a district court to use the Sentencing Guidelines to calculate a recommended sentencing range for the defendant, and then to consider whether a guideline sentence is appropriate in light of the factors enumerated in 18 U.S.C. § 3553(a). United States v. Zapata, 589 F.3d 475, 486 (1st Cir. 2009). The court may then choose to vary from the Guidelines sentence if justified by the particular circumstances of the case. See Gall v. United States, 552 U.S. 38, 46 (2007). Although defendants may appeal both the procedure used to calculate their Guidelines sentencing range and the overall substantive reasonableness of the sentence they receive, see Zapata, 589 F.3d at 486, Vázquez challenges only the calculation. On appeal, we review de novo the sentencing court's interpretation of the Sentencing Guidelines and review for clear error the court's findings of fact. United States v. Woodward, 277 F.3d 87, 91 (1st Cir. 2002).

Vázquez specifically challenges two of the variables in her sentencing equation. First, she objects to the court's attribution to her of approximately 100 grams of crack cocaine (86 grams more than the 14 grams she was convicted of selling to the

_____

that decision will not impact the facts considered by the district court in calculating Vázquez's sentence. Because the sentencing calculation issues will arise either way, we can decide those questions on this appeal, despite the fact that we are vacating one of Vázquez's three counts of conviction and remanding the case for further proceedings.

police informant).[11]  Second, she disputes the court's finding that a gun was possessed in connection with the charged conspiracy (resulting in an upward adjustment of her offense level).  Because these findings were made for purposes of sentencing, the prosecution had the burden to prove them by a preponderance of the evidence.  See United States v. Laboy, 351 F.3d 578, 582 (1st Cir. 2003) (drug quantity); United States v. Hoey, 508 F.3d 687, 691 (1st Cir. 2007) (facts central to upward adjustments in offense levels).  We take each of Vázquez's objections in turn.

### 1.    The Amount of Crack Cocaine

Vázquez alleges that there was insufficient evidence that the 100 grams of drugs existed, and even if they did, that they took the form of crack cocaine rather than powder cocaine (which is punished less severely under the Guidelines).  The record, however, amply supported the district court's calculation.  As to the nature of the product, Vázquez's conversations with the confidential informant made clear that she and Soto were in the business of selling crack cocaine, not powder.  Vázquez was, after all, convicted of selling crack.  Nor does the fact that powder cocaine was found in the search dictate a contrary conclusion, since powder

---

[11]It is not entirely clear from the transcript of the sentencing hearing whether the district court attributed to Vázquez 92, 96, 98, or 100 grams of crack cocaine.  However, all four quantities would yield the same base offense level of 26, which covers the range of 28 to 112 grams.  See U.S.S.G. § 2D1.1(c).

cocaine is the principal ingredient used to cook crack cocaine. See Kimbrough v. United States, 552 U.S. 85, 94 (2007). As for the quantity, Vázquez herself referred to having run out of "100 grams," and needing to travel to New York to get more. The cash found, minus the proceeds from the sale of a car, equaled the estimated sales proceeds of approximately 100 grams of crack.

Small-time drug dealers rarely "author[]. . . formal business plan[s] or keep[] meticulously detailed inventory records." United States v. Sklar, 920 F.2d 107, 111 (1st Cir. 1990). Therefore, "in a case where cash is seized and where either no drug is seized or the amount seized does not reflect the scale of the offense, the sentencing court may estimate the quantity of drugs with which Defendant was involved by converting cash to its drug equivalent." United States v. Rios, 22 F.3d 1024, 1028 (10th Cir. 1994). This method is commonplace in our circuit and in others. See, e.g., United States v. Chandler, 534 F.3d 45, 50-51 (1st Cir. 2008); United States v. Sepulveda, 102 F.3d 1313, 1318 (1st Cir. 1996); United States v. Jackson, 3 F.3d 506, 510-11 (1st Cir. 1993); see also United States v. Tokars, 95 F.3d 1520, 1541-42 (11th Cir. 1996) (collecting cases).

More broadly, Vázquez claims that she should not be held responsible for uncharged drug sales and objects to the attribution to her of any drugs beyond the 14 grams of crack she was convicted of selling. While perhaps surprising to a lay person, sentencing

courts routinely take into account as "relevant conduct" drug deals allegedly executed by defendants during the same approximate time periods as their charged transactions even though no jury has found the alleged deals to have occurred.[12]  The Sentencing Guidelines endorse that approach: "[I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."  U.S.S.G. § 1B1.3, cmt. background; see also United States v. Chuong Van Duong, 665 F.3d 364, 368 (1st Cir. 2012) ("Commentary to the guidelines is generally authoritative.").

Although "[n]ot every drug transaction undertaken by every drug trafficker is necessarily linked in a meaningful sense," the sentencing court in this case was permitted to attribute uncharged drug quantities to Vázquez so long as it found, by a preponderance of the evidence, "a sufficient link between the acts charged and those included for sentencing purposes." United States v. Santos Batista, 239 F.3d 16, 21 (1st Cir. 2001) (quoting United States v. Sklar, 920 F.2d 107, 111 (1st Cir. 1990)).  Vázquez was convicted both of conspiring to distribute crack cocaine between

---

[12]See, e.g., United States v. Márquez, 699 F.3d 556, 558, 560-61 (1st Cir. 2012); United States v. Barbour, 393 F.3d 82, 92 (1st Cir. 2004); Laboy, 351 F.3d at 581; United States v. Santos Batista, 239 F.3d 16, 21-27 (1st Cir. 2001); United States v. Tabares, 951 F.2d 405, 410 (1st Cir. 1991); see also U.S.S.G. § 1B1.3(a)(2); id. at § 3D1.2(d).

December 5 and January 16 and of actually distributing crack cocaine to the informant on December 6, and so it was reasonable for the sentencing court to consider as well her contemporaneous sales of that same drug to other buyers. Cf. United States v. Eisom, 585 F.3d 552, 557 (1st Cir. 2009) (listing factors to be considered when deciding whether to include uncharged drug sales in a Guidelines sentence calculation as "the nature of the offenses, their timing, their commonalities, and the existence or non-existence of overarching patterns").

For all of these reasons, the court did not clearly err by attributing 100 grams of crack cocaine to Vázquez when it calculated her Guidelines sentence.

### 2. Soto's Gun

Vázquez also challenges the district court's finding that a gun was possessed in connection with the charged conspiracy, increasing her base offense level by two (raising it to 28). See U.S.S.G. § 2D1.1(b). Vázquez stresses that the gun in question belonged to Soto, not to her, and that Soto only had possession of the weapon in October 2007--two months before the charged conspiracy had even begun.

As to who owned the gun, the Sentencing Guidelines plainly state that in cases of "jointly undertaken criminal activity," a defendant may be held responsible for "all reasonably

foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Vázquez does not dispute that she knew Soto possessed a gun. Indeed, she testified at trial that a gun was "accessible" to Soto, and that she had asked him not to keep the weapon in her house. The fact that Vázquez never handled the gun herself does not relieve her of responsibility for its foreseeable possession by a co-conspirator in connection with their drug dealing venture.

As to chronology, the Guidelines also make clear that the acts and omissions for which Vázquez was accountable included all those that were "part of the same course of conduct or common scheme or plan as the offense of conviction." See id. § 1B1.3(a)(2); see also id. § 3D1.2(d); id. § 2D1.1. That phrase has been interpreted to be "broader than, rather than coterminous with, the definition of a 'conspiracy' as that term of art is used in the overall criminal law." David v. United States, 134 F.3d 470, 476 (1st Cir. 1998). Accordingly, "conduct can still be relevant, though it may be outside the time frame of the charged conspiracy." Barbour, 393 F.3d at 92.

In Vázquez's case, the government presented evidence that she and Soto were engaged in the distribution of crack cocaine at least as far back as October 2007, the same month that Soto possessed the gun. Furthermore, even during the period of the conspiracy for which Vázquez was convicted, she was present during

-35-

a conversation concerning Soto's preferences regarding the gun's disposition and possible return to him. The sentencing court indicated that it was well aware of the danger posed by a boundaryless interpretation of the "relevant conduct" Guideline, and yet it still determined that Soto's gun possession was part of the same course of conduct as Vázquez's December through January crack cocaine conspiracy. The court did not clearly err by reaching that conclusion. See id.

Therefore, we find no error in the district court's calculation of Vázquez's Guidelines sentence.

### III. Conclusion

First, we conclude that the district court erred by denying Vázquez's motion to suppress without determining whether it was reasonable for law enforcement to believe that New Hampshire Probation and Parole had the authority to search without her consent. On remand, the district court will need to determine whether the facts as reasonably understood by the officers and agents at the scene gave them the authority to search Vázquez's home without consent. If so, the conviction on Count IV will stand and Vázquez need not be resentenced. Otherwise, the conviction on that count must be reversed, and Vázquez resentenced.

Second, we conclude that the district court committed no error by denying Vázquez's request for a duress instruction.

Finally, we conclude that the district court correctly calculated Vázquez's recommended sentence under the Sentencing Guidelines, although the district court will need to resentence Vázquez if, on remand, it reverses the conviction on Count IV.

Accordingly, we <u>affirm</u> Vázquez's first two counts of conviction and <u>vacate</u> her third count of conviction. We remand the case for further proceedings consistent with this opinion.

<u>So ordered</u>.