LIPEZ, Circuit Judge.
*586 This case requires us to consider the constitutional boundaries for the use of deception by law enforcement officers seeking consent for a warrantless search. We conclude that the search at issue here violated the Fourth Amendment because the circumstances -- including a lie that conveyed the need for urgent action to address a pressing threat to person or property -- vitiated the consent given by appellants. We further hold that the defendants are not entitled to qualified immunity from civil liability for the unlawful search because any reasonable officer would have recognized that the circumstances were impermissibly coercive. However, we reject a related claim alleging malicious prosecution on the ground that, even if it had merit, the defendants would be entitled to qualified immunity.
We therefore vacate in part and affirm in part the district court's grant of defendants' motion to dismiss plaintiffs' complaint.
I. Background
Appellant David Pagán-González claims that his Fourth Amendment rights were violated when federal agents unlawfully searched his computer, and when they subsequently arrested and detained him on child pornography charges based solely on the evidence obtained in the unlawful search. After the criminal charges were dropped, Pagán-González brought this suit for damages pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[1] In Part A, we recount the largely undisputed facts of the underlying events, setting forth the complaint's well-pleaded facts in the light most favorable to the plaintiff. See Germanowski v. Harris, 854 F.3d 68, 69 (1st Cir. 2017) ; Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011). In describing the objectives and conduct of the defendant law enforcement officers, we also rely on an affidavit submitted by one of the agents in support of the criminal complaint against Pagán-González.[2] In Part B, we describe the Bivens action and the district court's rationales for dismissing it.
A. The Challenged Conduct and Criminal Process
On October 23, 2013, approximately ten federal agents appeared at the door of the home shared by Pagán-González and his parents in Cabo Rojo, Puerto Rico. Special Agent Ana Moreno, one of two officers named as defendants,[3] identified herself as *587 an FBI agent and reported that the law enforcement officers were there because a modem in a computer at the house was "sending a signal and/or viruses to computers in Washington." In fact, an FBI agent had downloaded child pornography from a computer that agents believed was located at that address, and the agents had come to the home to investigate.
The agents asked the family for consent to inspect their computers and said they would try to fix the modem that was sending transmissions to Washington. The agents explained that, if they could not make the repair, they would take the faulty computer and provide a replacement at the FBI's expense. Pagán-González, age 21, and his parents signed consent forms authorizing the computer searches.
After inspecting two computers, the agents told the family they needed to take Pagán-González's laptop. Pagán-González's father protested because his son, a college student, needed the computer for his classes, but the agents told the family they could no longer "touch or access" the laptop because it contained evidence of a crime. The family was not told that the agents had determined that the laptop contained "possible child pornography in the form of graphics, videos, and search terms"--as Agent Bonilla later reported in the affidavit for the criminal complaint.
The computer seized from Pagán-González was further examined by the FBI's Computer Analysis Response Team ("CART"). According to the CART report, the laptop contained numerous images and videos of minors engaged in sexually explicit conduct and also revealed that Pagán-González had both received from others and shared child pornography. Agent Bonilla thus prepared the criminal complaint alleging that Pagán-González had transported and received child pornography in violation of 18 U.S.C. § 2252(a)(1) and (2). On December 11, 2013, a magistrate judge issued a warrant for his arrest.
Early the next morning, December 12, Pagán-González and his parents were awakened when armed federal agents "burst into their home" to arrest Pagán-González. He remained in custody until his parents were able to post bond a week later. On January 9, 2014, a federal grand jury indicted Pagán-González for the crimes charged in the criminal complaint. He subsequently filed a motion to suppress the evidence obtained from the search of his computer, arguing that the agents' misrepresentations about their investigative purpose limited or vitiated the consent given by the family for examination of their computers. Pagán-González asserted that the deception rendered the search "unreasonable and illegal" and, hence, a violation of his Fourth Amendment rights. Instead of responding to the suppression motion, the government filed a motion to dismiss the case "[i]n the interests of justice."
B. The Bivens Action
On December 12, 2014 -- exactly one year to the day after Pagán-González's arrest -- he and his parents filed this civil lawsuit.[4] Pagán-González alleged that he consented to the officers' entry and search only because the agents stated that they were looking for the source of the "signal and/or viruses" that had been detected in Washington, D.C. Hence, the entry, search, and seizure of the computers violated the Fourth Amendment because they were "tainted by Defendants' lie about the *588 true reason" of "why they were there" and "what they were looking for." The complaint also asserted that Pagán-González's arrest, detention, and indictment violated his Fourth and Fifth Amendment rights because federal authorities relied "exclusively" on the "illegally obtained evidence" from the search to support the charges against him.
The defendants moved to dismiss the complaint for failure to state a claim. They argued that (1) any claim related to the search itself was time-barred, (2) the agents' entry to plaintiffs' home and search of their computers was lawful, and (3) the agents were in any event protected from liability for the entry and search by the doctrine of qualified immunity. With respect to Pagán-González's allegations of improper arrest, detention, and indictment -- which they characterized as a cause of action for malicious prosecution -- the defendants argued that the claim failed because the criminal charges were supported by probable cause and because "unjustified prosecution" does not give rise to a Bivens claim.[5] The defendants' motion also challenged the factual adequacy of the claims, specifically with respect to Agent Bonilla's involvement in the search and Agent Moreno's involvement in the arrest and prosecution.
The district court dismissed the complaint in its entirety. See González v. Moreno, 202 F.Supp.3d 220 (D.P.R. 2016). The court held that the Fourth Amendment claim alleging that the agents unlawfully entered plaintiffs' home and searched their computers accrued on the day those acts occurred, October 23, 2013. Accordingly, it rejected that claim as time-barred because the suit was filed more than a year later, on December 12, 2014 -- i.e., outside the applicable one-year limitations period. Id. at 224. The court treated as timely Pagán-González's claim based on his arrest and the subsequent criminal process, but dismissed that claim as well because "the complaint is devoid of any allegations that would support a finding of lack of probable cause" for the charges brought against him. Id. at 226. Alternatively, the court concluded that the complaint did not provide a sufficient factual foundation to link the named defendants, Moreno and Bonilla, to the post-search criminal process underlying the malicious prosecution claim. See ids="12180016" index="9" url="https://cite.case.law/f-supp-3d/202/220/">id. at 226-27.
In rejecting the claims, the district court commented that it was "appalled at the allegations that FBI agents would ask to enter [Pagán-González's] home without a warrant, and through a ruse, obtain consent from all family members to search and seize [his] laptop." Id. at 227. Nonetheless, it found meritless "[p]laintiffs' contention that any evidence obtained in violation of [Pagán-González's] constitutional rights would negate the probable cause found in this case." Id. Noting that the exclusionary rule does not apply in civil cases, the court cited precedent holding that, in the context of a civil malicious prosecution claim, the reliance on unlawfully obtained evidence does not "nullify the officers' probable cause to arrest." Id. (quoting Medina v. Toledo, 718 F.Supp.2d 194, 207 (D.P.R. 2010), aff'd sub nom.
*589 Moreno-Medina v. Toledo, 458 Fed. App'x 4 (1st Cir. 2012) ).
C. The Appeal
On appeal, Pagán-González challenges the district court's holdings on the statute of limitations, the viability of his malicious prosecution claim, and the agents' entitlement to qualified immunity. Specifically, Pagán-González asserts that the Fourth Amendment claim based on the officers' entry to his home and search of his computer was timely because it did not accrue until the day of his arrest. As for deficiencies in the factual allegations, Pagán-González maintains that he should have been allowed to conduct discovery to ascertain "[t]he specific participation of each agent" in the challenged conduct. He also argues that the malicious prosecution claim should proceed because initiating and prosecuting criminal charges premised solely on illegally seized evidence violates the Constitution, and a reasonable officer would have understood as much.
Appellate review of a district court's grant of a motion to dismiss is de novo. Giragosian v. Bettencourt, 614 F.3d 25, 28 (1st Cir. 2010). We begin that review in Section II with the district court's ruling on the search-related Fourth Amendment claim. In Section III, we address the dismissal of the malicious prosecution claim.
II. The Entry to the Home and the Computer Search
A. Statute of Limitations
State law determines the statute of limitations for a federal civil rights cause of action, see Barrett ex rel. Estate of Barrett v. United States, 462 F.3d 28, 38 (1st Cir. 2006), and it is undisputed that Puerto Rico's one-year limitations period for personal injury actions applies here, see Roman v. Townsend, 224 F.3d 24, 29 (1st Cir. 2000) (noting "the settled proposition" that plaintiffs' Bivens claim was subject to Puerto Rico's one-year limitations period). The accrual date for such claims, however, is governed by federal law. "Under federal law, the statute of limitations on a Bivens claim begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." Barrett, 462 F.3d at 38-39 (quoting Van Tu v. Koster, 364 F.3d 1196, 1199 (10th Cir. 2004) ).
Pagán-González argues that the district court erred in finding that the entry-and-search claim accrued when the officers took those actions. We agree. On the day of the search, Pagán-González and his parents were told that the agents needed to enter their home and inspect their computers to address a virus or signal that was detected by authorities in Washington, D.C. They neither knew that day, nor had reason to know, that the agents had misrepresented their purpose and elicited consent to search based on a falsehood.[6] Although they were told that evidence of a crime had been found on Pagán-González's laptop, they could not have known that the evidence related to a crime committed by Pagán-González or to a matter other than the one the agents had identified as the reason they needed to search.
Hence, only when the agents returned on December 12 to arrest Pagán-González on the child pornography charges did he and his parents "know of the existence *590 and cause of the injury which is the basis of [the] action." Barrett, 462 F.3d at 39 (quoting Van Tu, 364 F.3d at 1199 ). In other words, not until the real purpose for the agents' actions was revealed could Pagán-González understand that the agents had deliberately misled him to elicit consent for a warrantless search -- a tactic he claims invalidated his acquiescence. The limitations period starts running "one day after the date of accrual," Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005), and thus the limitations period for Pagán-González's search-based claim began to run on December 13, 2013. Accordingly, the claim -- filed on December 12, 2014, the one-year anniversary of his arrest -- was timely.
B. The Merits and Qualified Immunity
Defendants argue that dismissal of the search-related claim should be upheld on the alternative ground that the ruse used by the officers was constitutionally permissible.[7] And, they say, "at the very least, the defendants are shielded from civil liability by qualified immunity." Both of those rationales are in fact components of the qualified immunity analysis. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " Dist. of Columbia v. Wesby, --- U.S. ----, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018) (emphasis added) (quoting Reichle v. Howards, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) ). Because we conclude that the officers' deception invalidated the consent given for their warrantless entry and search, thus rendering those actions unlawful, we must also consider the second prong of the inquiry: whether the defendants are nonetheless entitled to qualified immunity because no reasonable officer would have understood that her conduct violated the Fourth Amendment. See Hill v. Walsh, 884 F.3d 16, 21 (1st Cir. 2018) (citing Wesby, 138 S.Ct. at 589 ).
1. The Consent Exception to the Warrant Requirement
The sanctity of the home is at the core of the Fourth Amendment's protection against unreasonable governmental intrusions. See Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (quoting United States v. U.S. Dist. Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ) ). The Supreme Court has thus "consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." Steagald v. United States, 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Longstanding precedent, however, carves out an exception to the warrant requirement for consensual searches. See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ; United States v. Coombs, 857 F.3d 439, 448 (1st Cir. 2017). As one court has noted, "[a] validly obtained and voluntary consent renders a search or seizure reasonable, thus eliminating the need for a warrant."
*591 United States v. Parson, 599 F.Supp.2d 592, 601 (W.D. Pa. 2009).
The Supreme Court has described consent as a " 'jealously and carefully drawn' exception" to the warrant requirement. Georgia v. Randolph, 547 U.S. 103, 109, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (quoting Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) ). The government thus fittingly bears the burden to prove valid, voluntary consent, see Schneckloth, 412 U.S. at 222, 93 S.Ct. 2041 ; United States v. Vázquez, 724 F.3d 15, 18 (1st Cir. 2013), and courts evaluate voluntariness in this context with the same close scrutiny of the circumstances prescribed by the Supreme Court for assessing the voluntariness of a confession, see Schneckloth, 412 U.S. at 226-27, 93 S.Ct. 2041 ; Coombs, 857 F.3d at 449. That totality-of-the-circumstances review must take into account, where appropriate, "any evidence that law enforcement officers' fraud, deceit, trickery or misrepresentation prompted defendant's acquiescence to the search." United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008) ; see also, e.g., United States v. Spivey, 861 F.3d 1207, 1213 (11th Cir. 2017) ("Deceit can ... be relevant to voluntariness."); Vázquez, 724 F.3d at 19 (stating that courts must consider whether law enforcement officers' misrepresentations prompted defendant's consent to the search).[8]
Thus, to find the search lawful as the government urges, we must conclude that the consent to enter and search given by Pagán-González and his parents to the FBI agents was "validly obtained and voluntary" notwithstanding the agents' deception concerning their purpose. Parson, 599 F.Supp.2d at 601. Before evaluating the particular facts here, we describe the existing case law on the use of deception by law enforcement officers, including to obtain consent.
2. Deception by Government Authorities
i. General Principles
It is beyond debate that deception is a well-established and acceptable tool of law enforcement. See, e.g., Sorrells v. United States, 287 U.S. 435, 441, 53 S.Ct. 210, 77 L.Ed. 413 (1932) ("Artifice and stratagem may be employed to catch those engaged in criminal enterprises."). Indeed, undercover investigations in which government agents misrepresent their identities are ubiquitous and viewed as essential in the detection of crime. See, e.g., Lewis v. United States, 385 U.S. 206, 208-09, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) ("[I]t has long been acknowledged by the decisions of this Court that, in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." (citations and footnote omitted) ); ids="11336196" index="65" url="https://cite.case.law/us/385/206/#p208">id. at 210, 87 S.Ct. 424 (noting that a prohibition on the use of undercover agents would "severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest").[9] The right to *592 deceive, however, is not unbounded. "The various protections of the Bill of Rights ... provide checks upon such official deception for the protection of the individual." Id. at 209, 87 S.Ct. 424.
Consistent with the precedent described above, one such limitation is that government agents' deceptive tactics must not prevent a target from making "an essentially free and unconstrained choice" to forgo the constitutional protection of a warrant. Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041. In perhaps the most familiar undercover scenario -- a law enforcement officer posing as a drug buyer to gain entry to a home or hotel room -- the deception is deemed acceptable under the Fourth Amendment because the targeted seller has freely made the choice to expose his criminal activity to others. That is, he has voluntarily assumed the risk of inviting individuals whom he knows he cannot control into his residence. See Hoffa v. United States, 385 U.S. 293, 303, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ("The risk of being ... deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." (quoting Lopez v. United States, 373 U.S. 427, 465, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting) ) ); see also id. at 302, 87 S.Ct. 408 ("Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."); cf. Lewis, 385 U.S. at 211, 87 S.Ct. 424 ("A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.").
The dynamic is meaningfully different, however, when police officers identify themselves as such but misrepresent their purpose. Because citizens will respond to law enforcement with a sense of obligation and presumption of trustworthiness, multiple courts have held facially consensual searches to be invalid where the "consent" was elicited through officers' lies about the nature or scope of their investigations. See, e.g., United States v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990) (per curiam) (invalidating consent where federal agent investigating possible firearms violations was depicted as a state licensing official: "A ruse entry when the suspect is informed that the person seeking entry is a government agent but is misinformed as to the purpose for which the agent seeks entry cannot be justified by consent."); id. at 115 (stating that "entry ... acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation" violates the Fourth Amendment (quoting United States v. Little, 753 F.2d 1420, 1438 (9th Cir. 1984) ) ); SEC v. ESM Gov't Sec., Inc., 645 F.2d 310, 316-18 (5th Cir. Unit B May 1981) (holding that federal agent's deliberate, effective misrepresentation of purpose to gain access to records would be impermissible: "When a *593 government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations."); United States v. Tweel, 550 F.2d 297, 300 (5th Cir. 1977) (finding consent vitiated by misrepresentation that investigation was civil, not criminal); Parson, 599 F.Supp.2d at 608 (finding government's burden to show voluntary consent unmet where, inter alia, agents investigating child pornography gained entry and searched a computer after advising the defendant he might be a victim of identity theft); People v. Daugherty, 161 Ill.App.3d 394, 112 Ill.Dec. 762, 514 N.E.2d 228, 233 (1987) ("Where, as here, the law enforcement officer without a warrant uses his official position of authority and falsely claims that he has legitimate police business to conduct in order to gain consent to enter the premises when, in fact, his real reason is to search inside for evidence of a crime, we find that this deception under the circumstances is so unfair as to be coercive and renders the consent invalid."); cf. United States v. Watzman, 486 F.3d 1004, 1007 (7th Cir. 2007) (noting that government did not challenge finding that search was invalid where officers conducted a "phony 'burglary follow-up' " ruse to investigate child pornography); United States v. Turpin, 707 F.2d 332, 334 (8th Cir. 1983) (upholding lawfulness of consent search, but stating that "[m]isrepresentations about the nature of an investigation may be evidence of coercion").
Courts troubled by agents' lies about the searches they seek to conduct have worried that condoning such falsehoods "would obliterate citizens' widely shared social expectations that they may place some modicum of trust in the words of government officials acting as such," with that lack of trust producing "catastrophic consequences." Parson, 599 F.Supp.2d at 606. In a passage quoted multiple times by other courts, the Fifth Circuit observed that private individuals have "the right to expect that the government, when acting in its own name, will behave honorably." ESM Gov't Sec., Inc., 645 F.2d at 316. In particular, the court stated, "[w]e think it clearly improper for a government agent to gain access ... which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust." Id.; see also Parson, 599 F.Supp.2d at 606 ("Society expects that law enforcement officers who present themselves and show badges will be honest and forthright with the community that they serve.").
Yet, despite the broadly framed objections of courts to deception by known government agents, the general consensus in the case law is that such deception, including lying about the purpose of an investigation, is not categorically off-limits in obtaining consent to search.[10] The question *594 instead is whether the deception in context rendered the consent involuntary. In a recent Eleventh Circuit decision, for example, the court acknowledged that "fraud, deceit or trickery in obtaining access to incriminating evidence can make an otherwise lawful search unreasonable," Spivey, 861 F.3d at 1214 (quoting United States v. Prudden, 424 F.2d 1021, 1032 (5th Cir. 1970) ) (emphasis added in Spivey ), but cautioned that deception by officers relying on their status as government agents "does not always invalidate consent," id.; see also id. at 1215 (stating that the ruse used by officers "was a relatively minor deception that created little, if any, coercion"). See also, e.g., People v. Zamora, 940 P.2d 939, 943 (Colo. App. 1996) (upholding trial court's finding of consent "[a]lthough the officers may have partially misrepresented their purpose by not disclosing they were investigating a rape rather than a domestic dispute").
Spivey, in which one panel member dissented,[11] provides a useful illustration of the other considerations that may come into play in assessing the impact of deception by known government agents. There, a pair of defendants sought to suppress evidence of credit card fraud found at their home on the ground that the searching officers had obtained consent to search by falsely claiming to be following up on two burglaries the defendants had reported. See 861 F.3d at 1210. In reality, the burglar already had been caught, and he had told the police about the fraud evidence he had seen at the defendants' home. Id. at 1210-11.
Despite the officers' misrepresentation of their purpose, the panel majority upheld the district court's finding that the consent to search was voluntary. The majority emphasized that one of the defendants had "made a strategic choice to report the burglary and to admit the officers into her home." Id. at 1211. In those circumstances, the judges explained, it was not "clear error for the district court to find that, although the burglary investigation was 'not the main or real reason' for the search, it was 'a legitimate reason for being there.' " Id. at 1214. And, importantly, the consenting defendant "understood that she faced a risk that [the law enforcement agent] would notice evidence of the credit-card fraud." Id. at 1215 ; see also id. at 1216 ("Austin and Spivey informed the police of the burglaries and invited their interaction. The officers did not invent a false report of a burglary, nor claim any authority that they lacked.").
ii. Consensus on Impermissibly Coercive Deception
Notwithstanding the need in each case to consider the totality of the circumstances, there is consensus in the precedents that two types of deception have an impermissibly coercive effect. First, the Supreme Court has soundly rejected the consent to search obtained by officers who falsely claim they have a warrant. See Bumper v. North Carolina, 391 U.S. 543, 550, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). That situation, the Court explained, is "instinct with coercion" because the officer "announces in effect that the occupant has no right to resist the search." Id. It is thus well established, in our own law and elsewhere, that "deception invalidates consent *595 when police claim authority they lack." Spivey, 861 F.3d at 1213 ; see also, e.g., Vázquez, 724 F.3d at 22 ("The law is clear ... that consent to a search is invalid if given only because of an officer's knowingly false assurance that there will soon be a lawful search anyway." (citing Bumper ) ); Hadley v. Williams, 368 F.3d 747, 749 (7th Cir. 2004) (stating that consent was "vitiated not only by the claim of the police to have a warrant ... but also by fraud," and explaining that the consent "was procured by an outright and material lie [that the police had a warrant], and was therefore ineffectual").
Second, relying on equivalent reasoning, courts have regularly held that coercion is implicit when officers falsely present a need for urgent action: "[W]hen an officer lies about the existence of exigent circumstances, he also suggests that the occupant has no right to resist and may face immediate danger if he tries." Spivey, 861 F.3d at 1213 (citing United States v. Harrison, 639 F.3d 1273 (10th Cir. 2011), where "agents falsely implied that a bomb was planted in the apartment they sought to search"); see also United States v. Montes-Reyes, 547 F.Supp.2d 281, 291 (S.D.N.Y. 2008) (finding lack of consent where officers falsely stated they sought entry to hotel room to search for a missing girl, but planned to search for drugs, because police fabricated a "grave emergency"); Krause v. Commonwealth, 206 S.W.3d 922, 926 (Ky. 2006) (finding coercion where officers obtained consent to search a residence based on a false report that a young girl claimed she had been raped at that location); People v. Jefferson, 43 A.D.2d 112, 350 N.Y.S.2d 3, 4 (1973) (per curiam) (finding that "the ruse [of a possible gas leak] used by the police to gain access to the apartment and therefore the subsequent search and arrests were violative of defendant's constitutional rights"); cf. United States v. Hardin, 539 F.3d 404, 424-25 (6th Cir. 2008) (finding that consent would be invalid where apartment manager, acting at behest of police, entered apartment purportedly to investigate a non-existent water leak); Zamora, 940 P.2d at 943 (finding valid consent, but noting that "[t]he police did not feign an emergency, conceal their identities, or misrepresent their authority").[12]
Beyond the coercion inherent in the false emergency scenario, multiple courts have emphasized "the potential public policy hazard created when police officers make false claims of exigent circumstances." Montes-Reyes, 547 F.Supp.2d at 288 n.10.
In order to ensure cooperation in truly life-threatening situations, it is vital to maintain the public trust in emergency services. When the police or the gas company come to the door warning of a real gas leak or other life-threatening emergency, it is in everyone's interest that they be believed. Sanctioning the type of deception engaged in here [phony *596 gas leak] would send a message to all those with reason to fear "the system" (whether they be law abiding or law breaking) that emergency warnings cannot be trusted.
United States v. Giraldo, 743 F.Supp. 152, 154 (E.D.N.Y. 1990) (quoted in Montes-Reyes, 547 F.Supp.2d at 288 n.10 )[13] ; see also Krause, 206 S.W.3d at 926 (stating that, if the court sanctioned ruse of false report of young girl's rape, "citizens would be discouraged from 'aiding to the utmost of their ability in the apprehension of criminals' since they would have no way of knowing whether their assistance was being called upon for the public good or for the purpose of incriminating them" (quoting Schneckloth, 412 U.S. at 243, 93 S.Ct. 2041 ) ). This exigent circumstances extension of "the Bumper coercion principle" is widely recognized. Laurent Sacharoff, Trespass and Deception, 2015 B.Y.U. L. Rev. 359, 381-82 (discussing the "line of cases" in which "police lie in such a way that the resident feels no choice but to allow the search"); see also 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(n) (5th ed. 2017) (noting that "[t]he critical fact in Jefferson [the gas leak ruse] ... was that the police in effect deprived the defendant of a free choice in deciding whether to surrender his privacy, for they made it falsely appear that a failure to permit entry might result in injury to persons and property"); Montes-Reyes, 547 F.Supp.2d at 287-88 (noting "universal[ ] agree[ment]" that consent is invalid when officers give "the impression that ... consent cannot be lawfully withheld," and noting cases finding involuntariness when officers invoke "dire or otherwise exigent circumstances" to suggest that "consent to search was required to prevent a[n] impending calamity").
Thus, to sum up, while the fact-specific nature of the voluntariness inquiry makes it difficult to draw many bright lines "within this murky area of law concerning consents [to search] obtained by deception as to purpose," 4 Search & Seizure, supra, § 8.2(n), courts have uniformly recognized that the Fourth Amendment may be violated when consent is obtained through a law enforcement officer's false claim of authority or lies conveying an exigent need for the search. In such instances, the deception may be sufficient on its own to vitiate the voluntariness of the resulting "consent." See Bumper, 391 U.S. at 548-49, 88 S.Ct. 1788 (stating that the government's burden of proving that consent was "freely and voluntarily given" "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); see also 4 Search & Seizure, supra, § 8.2(a) (noting that "[o]ne factor very likely to produce a finding of no consent under the Schneckloth voluntariness test is an express or implied false claim by the police that they can immediately proceed to make the search in any event" (footnotes omitted) ); 2 Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (4th ed. 2017) (observing that consent obtained by means of "extreme" misrepresentations that allow no meaningful option to refuse "should not be considered valid"). Indeed, the government in this case recognizes these two categories of cases in which the deception is incompatible with consent. See Appellee's Br. at 15, 16 (recognizing (1) inherent coercion when officer falsely asserts that suspect has no right to refuse the search and that (2) "an officer may not use a ruse that, if it were true, would give the suspect no real choice but to consent").
3. The Challenged Search
Against the backdrop of the law described above, and mindful of "the demanding *597 scrutiny required by the Schneckloth court" in assessing consent, United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989), we have little difficulty concluding that the entry and search as alleged in Pagán-González's complaint violated the Fourth Amendment.[14] Roughly ten FBI agents appeared at appellant's door with the alarming news that computers in Washington, D.C. -- the heart of the country's political and military operations[15] -- were receiving signals or viruses from a computer at appellant's location. If the report of a virus infecting technology in the nation's capital was not itself enough to convey an urgent need to address a pressing threat, the show of force by the federal agents elevated the seriousness of the situation and communicated that the problematic computer posed a substantial threat -- perhaps even to the nation's security.
To be sure, the fabricated emergency was not one that presented an immediate threat to the personal safety of Pagán-González, his parents, or any particular individual -- as would a gas leak or a bomb. See supra Section II.B.2.ii. However, we reject the government's suggestion that a finding of coercion based on fabricated exigent circumstances is limited to lies about an imminent physical danger or "a time-critical investigation involving the well-being of a vulnerable person." There is nothing fanciful about the havoc that could be wreaked by a computer attack on the federal government. By late 2013, when the conduct at issue here occurred, cyber security was a major concern within the FBI itself, and the serious threat posed by cyberattacks also was public knowledge. In March 2012, for example, the FBI's then-top official on cybercrime stated that terrorist groups were "increasingly ... seeking to use the network to challenge the United States by looking at critical infrastructure to disrupt or harm the viability of our way of life." FBI, Interview with Shawn Henry, https://www.fbi.gov/news/stories/the-cyber-threat (March 27, 2012). An executive order issued by the White House in February 2013 likewise warned that "[t]he cyber threat to critical infrastructure continues to grow and represents one of the most serious national security challenges we must confront." Exec. Order No. 13636, Improving Critical Infrastructure Cybersecurity, 78 Fed. Reg. 11,739 (Feb. 12, 2013), 2013 WL 596302. Public news accounts included a New York Times story in March 2013 reporting that the nation's top intelligence official "suggested that such attacks now pose the most dangerous immediate threat to the United States, even more pressing than an attack by global terrorist networks." Mark Mazzetti & David E. Sanger, "Security Leader Says U.S. Would Retaliate Against Cyberattacks," NY Times (Mar. 12, 2013), https://www.nytimes.com/2013/03/13/us/intelligence-official-warns-congress-that-cyberattacks-pose-threat-to-us.html.
In addition, the severity of the purported threat in this instance was made plain *598 by the number of agents dispatched to address it. Both of these factors -- the claimed threat and the significant show of force -- are consequential in assessing the voluntariness of Pagán-González's consent to enter and search. See 4 Search & Seizure, supra, § 8.2(b) ("It is significant ... that consent has been obtained while the consenting party was confronted by many police officers."); 2 Criminal Procedure, supra, § 3.10(c) (stating that consent "should not be considered valid" when the fabricated scenario is "so extreme" that the individual cannot fairly assess "the need to surrender his privacy").
Nor do other factors diminish the coerciveness of these aspects of the encounter. Pagán-González's education and family support might have enabled him to resist some types of official deception, cf., e.g., Parson, 599 F.Supp.2d at 607 (noting, inter alia, that target of identity theft ruse was a 65-year-old with medical issues, including limited ability to see, and was living alone on a low fixed income), but not the sort of fabricated emergency created by the officers in this case. This was not a situation in which government agents were merely offering help to a private citizen. Unlike in Spivey, where the officers were responding to the defendants' request for help, or Parson, where the officers were purporting to protect the defendant from identity theft, the agents here relied on the predictable acquiescence of citizens to assist law enforcement when pressed to do so -- and in a situation where it reasonably could be inferred that national interests were at stake. See, e.g., Krause, 206 S.W.3d at 927 ("What distinguishes this case most, perhaps, from the bulk of other ruse cases is the fact that [the officer] exploited a citizen's civic desire to assist police in their official duties for the express purpose of incriminating that citizen.").
In short, the totality of the circumstances as alleged point strongly to a situation involving "an unwitting, trusting beguilement," Spivey, 861 F.3d at 1216, in which Pagán-González -- pressured by the urgency of the threat posed by the ruse and intimidated by the agents' en masse arrival -- felt he had no choice but to allow the agents access to his home and computer. Viewing the allegations in the complaint favorably to the plaintiff, the government has not met its burden to prove voluntariness. See Schneckloth, 412 U.S. at 222, 93 S.Ct. 2041 ; Vázquez, 724 F.3d at 18. Absent valid consent, the warrantless entry to Pagán-González's home, and the search and seizure of his computer, violated the Fourth Amendment.
4. Qualified Immunity
Having concluded that the search as alleged violated the Constitution, we turn to the second prong of the qualified immunity inquiry: whether the unlawfulness of the agents' conduct was clearly established at the time they acted. See, e.g., Wesby, 138 S.Ct. at 589. In assessing the clarity of the law, we look to " 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to signal to a reasonable officer that particular conduct would violate a constitutional right." Morse v. Cloutier, 869 F.3d 16, 23 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ). A legal principle can be "clearly established" without factually identical precedent, although the existing case law must have placed the specific constitutional or statutory question "beyond debate." Mullenix v. Luna, --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). Put another way, the law must have been sufficiently clear that "any reasonable official in the defendant's position *599 would have known that the challenged conduct is illegal 'in the particular circumstances that he or she faced.' " Rivera-Corraliza v. Morales, 794 F.3d 208, 214-15 (1st Cir. 2015) (quoting Plumhoff v. Rickard, 572 U.S. 765, 779, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014) ). Such precision ensures that government officials are "penalize[d] ... for violating 'bright lines,' [but] not for making 'bad guesses in gray areas.' " Id. at 215 (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) ).
The government argues that the defendants in this case are entitled to qualified immunity because there is no consensus on "what constitutes permissible deception in enforcing the criminal law." Appellee's Br. at 23 (quoting 4 Search & Seizure, supra, § 8.2(n) ). Pointing out that the plaintiffs themselves have conceded that "there is no Supreme Court or First Circuit case forbidding agents from using a ruse," the government goes on to characterize this case as one in which "known officers misrepresent[ed] their investigative purpose and claim[ed] to be investigating one crime when they are really investigating another." Id. at 22. "[E]ven if some such ruses may be out of bounds," the government states, law enforcement officers cannot be expected to "identify[ ] the proscribed variety in advance." Id. at 23.
But the question on which qualified immunity turns in this case is not whether government agents ever may use a ruse to obtain consent for a warrantless search. Under current law, they clearly may. Hence, plaintiffs' "concession" that ruses have never been prohibited by the Supreme Court or our court is irrelevant to our inquiry. The government likewise misses the mark in pressing the lack of clarity on the lawfulness of ruses in which officers obtain consent by misrepresenting the crime they are investigating. Importantly, the deception that prompted Pagán-González's consent was not simply a lie about the purpose of the agents' search, but it involved fabrication of an emergency. In other words, the facts as alleged implicate the narrow line of cases described above in Section II.B.2.ii. See Mullenix, 136 S.Ct. at 308 (observing that the clearly established "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition' ") (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ) ). The contrast with the facts underlying the Eleventh Circuit's decision in Spivey, where the majority found valid consent, is illustrative of this distinction. See 861 F.3d at 1210-11. There, the officers purported to be investigating burglaries at the request of the homeowners -- a scenario far different from the fabricated emergency precedent.
Hence, the second-prong question we must address is whether the "robust 'consensus of cases' " on fabricated exigent circumstances put the defendants on notice of the unconstitutionality of their particular ruse. al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074 (quoting Wilson, 526 U.S. at 617, 119 S.Ct. 1692 ); see also Wesby, 138 S.Ct. at 590 ; Rivera-Corraliza, 794 F.3d at 214-15. Even more specifically, we must consider whether a reasonable law enforcement officer would have understood that the false report of a virus threatening computers in Washington, D.C., conveyed to Pagán-González at his home by a force of ten federal agents identified as such, was materially equivalent to the ruses in the fabricated emergency precedent and thus invalidated his consent to search. See generally Mullenix, 136 S.Ct. at 308 (emphasizing that "[t]he dispositive question is 'whether the violative nature of particular conduct is *600 clearly established' " (quoting al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074 ) (emphasis added in Mullenix ) ).
Essentially for the reasons leading us to conclude that Pagán-González's complaint states a claim for an unlawful search under the Fourth Amendment, we also hold that the virus ruse falls squarely within the "body of relevant case law" in which consent premised on a fabricated emergency was found invalid. Wesby, 138 S.Ct. at 590 (quoting Brosseau, 543 U.S. at 199, 125 S.Ct. 596 ); see also City of Escondido, Cal. v. Emmons, --- U.S. ----, 139 S.Ct. 500, 503-04, 202 L.Ed.2d 455 (2019) (per curiam). The clear and primary rationale of this line of precedent is that the consenting individual had no real option to deny access to his home or property because the threat depicted by law enforcement agents was so imminent and consequential that only immediate access could prevent severe harm. In the "explosion" cases -- involving lies about bombs or a gas leak -- officers used the threat of personal harm and destruction of the individual's residence. See Harrison, 639 F.3d at 1276 (agents falsely reported receiving an anonymous phone call reporting bombs in the apartment); Giraldo, 743 F.Supp. at 153 (agents falsely reported possible gas leak); Jefferson, 350 N.Y.S.2d at 4 (officers falsely stated they were investigating a gas leak). In the cases involving young girls, the need to find a missing child or the accusation of a rape likewise presented scenarios where time was of the essence. See Montes-Reyes, 547 F.Supp.2d at 291 (observing that "the 'missing girl' ruse ... created a false sense of exigent circumstances similar to that raised in a 'gas leak' scenario"); Krause, 206 S.W.3d at 926 (involving the fabricated need to search based on the "unnerving news [that] a young girl had just been raped"); cf. Zamora, 940 P.2d at 943 (noting, in finding consent valid where officers seeking perpetrator of thirteen-year-old's rape misrepresented their purpose as investigating a domestic dispute, that "[t]he police did not feign an emergency").
No reasonable law enforcement officer could fail to understand the similar compulsion that is inherent in the lie used in this case. See Wesby, 138 S.Ct. at 590 (noting that, to meet the qualified immunity standard, "there does not have to be 'a case directly on point,' " but it is necessary to "identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment" (quoting al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074 ; White v. Pauly, --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam) ) ). Indeed, the potential impact of the implied cyberattack carried out in part via Pagán-González's computer on the nation's capital was broader than the harms presented in the cases described above -- implicating national security -- and, as we have noted, the threat posed by such an attack was a well-known phenomenon by 2013. See supra Section II.B.3.
Moreover, the precedent further makes plain that surrounding conditions can contribute to the coerciveness of the encounter. In Krause, for example, the court noted the "alarming" timing of the confrontation -- "[a] knock on the door at 4:00 a.m. by uniformed police officers" -- and the target's additional vulnerability because of the "heinous and shameful accusation" that someone in the residence had raped a young girl. 206 S.W.3d at 926. Here, the severity of the threat was clearly communicated to Pagán-González by the arrival on his doorstep of ten federal agents.
Accordingly, every reasonable officer would have understood that the ruse used here, carried out in a manner that signified an emergency, would leave an individual *601 with effectively no choice but to allow law enforcement officers inside his home so they could attempt to alleviate the grave threat. And, in turn, a reasonable officer would have known that thus denying Pagán-González a "free and unconstrained choice" to forgo the constitutional protection of a warrant was a violation of his Fourth Amendment rights. Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041. Indeed, as noted above, the government itself acknowledges the clarity of the rule that "an officer may not use a ruse that, if it were true, would give the suspect no real choice but to consent." That lack of options is the necessary inference from the facts alleged in Pagán-González's complaint. Defendants are therefore not entitled to qualified immunity on appellant's search-based Fourth Amendment claim.
III. Malicious Prosecution
Pagán-González argues that he also has a viable Fourth Amendment claim for malicious prosecution because the defendants relied solely on the evidence obtained in the unlawful search of his computer in arresting and charging him. As the district court noted, to succeed on a malicious prosecution claim, our case law states that a plaintiff must "establish that: 'the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.' " Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) ). Pagán-González contends that his claim meets each of these requirements because, inter alia, the government voluntarily dismissed the criminal proceedings against him (thus, in his view, terminating the prosecution in his favor), and, excluding the unlawfully obtained evidence, his arrest and prosecution were unsupported by probable cause.
The government counters that Pagán-González fails on multiple grounds to state a constitutional claim of malicious prosecution. First and foremost, it challenges Pagán-González's assertion that evidence obtained from an unlawful search may not be used to support a finding of probable cause for arrest, detention, and prosecution. Citing published decisions from other circuits and unpublished decisions of our own court, the government points out that the exclusionary rule has been held to apply only in criminal proceedings. See, e.g., Lingo v. City of Salem, 832 F.3d 953, 960 (9th Cir. 2016) (joining other circuits in "rejecting [ § 1983 plaintiff]'s suggestion that probable cause to arrest may be supported only by information that was obtained in accordance with the Fourth Amendment"); Townes v. City of New York, 176 F.3d 138, 148 (2d Cir. 1999) (holding that "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy ... [,] but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution"); see also id. at 149 ("The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."); Machado v. Weare Police Dep't, 494 Fed. App'x 102, 106 (1st Cir. 2012) (per curiam) (noting that evidence arguably seized in violation of the Fourth Amendment "is not subject to the exclusionary rule" in civil proceedings, "and amply provides probable cause to justify [plaintiff's] arrest").
The widespread view that probable cause to arrest or prosecute may be established in civil proceedings with unlawfully seized evidence means that, regardless of our view on the merits of Pagán-Gonzá
*602 lez's malicious prosecution claim, the defendants are entitled to qualified immunity on that claim. Put simply, no clearly established law barred the defendants from using evidence obtained in the unlawful search to support probable cause for the criminal charges brought against Pagán-González.
In so concluding, we do not reach the first question of the qualified immunity analysis, i.e., whether Pagán-González might in fact have a viable Fourth Amendment claim stemming from his arrest and pre-trial detention. Pagán-González fails to develop fully an argument that he has satisfied the unsupported-by-probable-cause requirement stated in Hernandez-Cuevas notwithstanding the "real," but unlawfully obtained, evidence of his criminal activity the officers submitted to the magistrate judge. Nor does he suggest an alternative analysis for considering his unlawful detention claim under the Fourth Amendment, such as the forceful theory of relief described by our colleague in his thoughtful concurrence. See generally Manuel v. City of Joliet, III., --- U.S. ----, 137 S.Ct. 911, 919, 197 L.Ed.2d 312 (2017) (noting that, where a "judge's order holding [arrestee] for trial ... lacked any proper basis," the "ensuing pretrial detention, no less than [the] original arrest, violated [arrestee's] Fourth Amendment rights"); see also id. at 926 (Alito, J., dissenting) (stating that "malicious prosecution is a strikingly inapt 'tort analog[y],' Wilson [v. Garcia ], 471 U.S. [261], 277 [105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) ] for Fourth Amendment violations" (alteration in original) ).
Accordingly, the district court properly dismissed the malicious prosecution claim on the ground that defendants are entitled to qualified immunity.
IV. Conclusion
For the reasons given above, we vacate the dismissal of appellants' search-based Fourth Amendment claim. In remanding for further proceedings on that claim, we leave it to the district court to address both defendants' contention that the complaint fails to adequately allege Agent Bonilla's responsibility for the search and plaintiffs' related request for discovery. We affirm the dismissal of the malicious prosecution claim based on qualified immunity.
Vacated in part, affirmed in part, and remanded for further proceedings consistent with this opinion. Two-thirds costs to appellants.

A Bivens claim is an implied cause of action for civil damages against federal officials that we treat for qualified immunity purposes as equivalent to the statutory cause of action against state officials provided by 42 U.S.C. § 1983. See Hernandez-Cuevas v. Taylor, 723 F.3d 91, 93 n.1 (1st Cir. 2013) ; see also Pearson v. Callahan, 555 U.S. 223, 238 n.1, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (noting parenthetically that "the Court's decisions equate the qualified immunity of state officials sued under 42 U.S.C. § 1983 with the immunity of federal officers sued directly under the Constitution" in a Bivens action (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 & n.30, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ) ).

The criminal complaint and affidavit were attached as exhibits to appellant's civil complaint. See, e.g., Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 72 (1st Cir. 2014) (stating that, in reviewing a motion to dismiss for failure to state a claim, courts consider "the complaint, documents attached to it, and documents expressly incorporated into it").

The second named officer, Agent Claudia I. Bonilla, signed the affidavit submitted with the criminal complaint. The civil complaint in this case also listed as defendants "Unknown Agents of the FBI and/or Federal Task Force 1 to 15," Moreno and Bonilla's husbands, and the two officers' conjugal partnerships.

For the sake of simplicity, we refer to the claims and arguments on appeal as if raised only by Pagán-González. However, his parents -- David Pagán-Albino and Isabel González-Torres -- and their conjugal partnership also are plaintiffs-appellants with respect to the search-related claim.

In their motion to dismiss, the defendants observed that Pagán-González appeared to invoke only the Fifth Amendment as the basis for the malicious prosecution claim. The district court, however, viewed the malicious prosecution allegations to assert both Fourth and Fifth Amendment violations, but then found that the claim was cognizable only under the Fourth Amendment. See González v. Moreno, 202 F.Supp.3d 220, 225 n.3 (D.P.R. 2016) (citing Hernandez-Cuevas, 723 F.3d at 94 ). On appeal, neither party protests the court's approach to the malicious prosecution claim; accordingly, we limit our analysis to the Fourth Amendment.

Agent Bonilla's affidavit states that, during the agents' first visit to his home, Pagán-González acknowledged that "he would download and exchange images and videos of minors engaging in sexual activity." However, Pagán-González has denied making that admission, and, taking the facts in the light most favorable to him, we disregard the asserted admission in assessing the claims.

Pagán-González appears to have appealed only the statute-of-limitations ruling on the search claim. However, the government makes no waiver argument concerning the merits and, indeed, it urges us to find in its favor on the validity of the search. We may affirm the dismissal on any ground supported by the record, see, e.g., Flores v. OneWest Bank, F.S.B., 886 F.3d 160, 164 (1st Cir. 2018), and, accordingly, we discuss the merits.

We have observed that other
[f]actors relevant to voluntariness may include, but are not limited to: (i) the consenter's age, education, past experiences, and intelligence; (ii) whether law enforcement officials advised the consenter of his constitutional right to refuse consent; (iii) the length and conditions of the consenter's detention and/or questioning; and (iv) law enforcement officials' use of any inherently coercive tactics.
Vanvliet, 542 F.3d at 264 n.2.

We note that, despite widespread acceptance, not everyone agrees that nondisclosure or an affirmative misrepresentation of a police officer's identity is compatible with a finding that the unknowing or deceived defendant acted voluntarily in interacting with law enforcement. See 2 Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (4th ed. 2017) :
Though some consider even Lewis as objectionable on the ground that we should "regard deliberate deception about an obviously material -- indeed controlling -- fact as inconsistent with voluntariness," a more appropriate concern is that of keeping the above-stated principle within reasonable bounds. One attractive proposal is that permissible deception by a stranger must include a stated intention on his part to join the consenting party in criminal activity, for in that way innocent persons will be spared from intrusions upon their privacy by deception.
(Footnotes omitted.)

Multiple commentators, however, have questioned the constitutional validity of officer deception about purpose in seeking consent to search. See, e.g., Laurent Sacharoff, Trespass and Deception, 2015 B.Y.U. L. Rev. 359, 364 (2015) (relying on Supreme Court's trespass analysis in recent Fourth Amendment cases to propose that "when a person lies about her identity and purpose to obtain consent to enter private property, that deception vitiates consent, thereby transforming the entry into a trespass"); id. at 366-67 (stating that police deception should fall within this rule); William E. Underwood, Note, A Little White Lie: The Dangers of Allowing Police Officers to Stretch the Truth as a Means to Gain a Suspect's Consent to Search, 18 Wash. & Lee J. Civ. Rts. & Soc. Just. 167, 206 (2011) (proposing, as a "workable rule," that when police officers identify themselves as such, they "must fully inform the suspect of the main purpose of their visit in order to validly obtain any consent to search" (emphasis omitted) ); Rebecca Strauss, Note, We Can Do This the Easy Way or the Hard Way: The Use of Deceit to Induce Consent Searches, 100 Mich. L. Rev. 868, 882 (2002) (stating that "courts should consider deceit as coercion," and, "[s]ince coercion negates consent, police deception should negate any resulting consent").

The Supreme Court denied certiorari in the case. See Spivey v. United States, --- U.S. ----, 138 S.Ct. 2620, 201 L.Ed.2d 1031 (2018).

In United States v. Wei Seng Phua, the court addressed circumstances that it acknowledged did not rise to the level of exigent because the agents "did not lie about an emergency or life-threatening situation." 100 F.Supp.3d 1040, 1051 (D. Nev. 2015). The agents there had cut off internet service to a hotel room and then posed as repairmen so they could search for evidence of an illegal sports betting operation. Id. at 1045. Nonetheless, the court found that the consent given was invalid. Noting the widespread use of cable, telephone, and internet services, the court concluded that "policy concerns also weigh against allowing the government to use a ruse of this type." Id. at 1052. It observed that "[m]ost reasonable people would invite a third party repair person into their home if they were led to believe it was necessary to fix a problem with those services." Id. Wei Seng Phua also differs from the cases described above, of course, because the government agents disguised their identities.

In Giraldo, the agents were disguised as gas company employees.

The voluntariness of appellant's consent is, of course, a fact-based inquiry properly conducted by the district court in the first instance. See, e.g., Vanvliet, 542 F.3d at 264. Accordingly, our discussion addresses only the viability of the Fourth Amendment claim as alleged -- i.e., whether the facts of the search as depicted in the complaint show a Fourth Amendment violation and, if so, whether the defendants are entitled to qualified immunity.

As plaintiffs noted in their opposition to defendants' motion to dismiss, the agents' statement about viruses affecting computers in "Washington" was an "obvious reference to Government computers." Pagán-González v. Moreno, Civ. No. 3:14-01899 (GAG), Dkt. No. 25, at 20 (filed Nov. 2, 2015).